St. Louis, Iron Mountain & Southern Railway Company
v. Washington.

Opinion delivered July 13, 1914.

1. Master and servant—negligent act of servant—dynamite.— Where a railroad company, through its engineer, causes dynamite to be used in blowing up piling, it will be liable in damages for an injury sustained by appellee, who was hit and injured by a falling substance, thrown by the explosion.

2. Negligence—injury to plaintiff—dynamite—liability.—Where a railroad company is actually engaged in removing piling for a drainage ditch through its right-of-way, it is liable for an injury occasioned by an explosion of dynamite used in removing the piling, and it makes no difference whether or not the railroad was doing the work in pursuance of an agreement with the ditch contractors that it do the same.

Appeal from Jefferson Circiut Court; *Antonio B. Grace,* Judge; affirmed.

STATEMENT BY THE COURT.

This suit is for damages for a personal injury to Chas. A. Washington, alleged to have been caused from the explosion of dynamite used in blasting out some piling from the railroad's right-of-way in constructing a ditch or canal through it. Hahn & Carter, in March, 1913, were contractors digging a public drainage ditch, which was planned to cross the right-of-way of the St. Louis, Iron Mountain & Southern Railway Company a short distance from a trestle about one mile south of Tamo. A dredge boat equipped with a steam shovel was used in its construction, and it was necessary that the track of the railway company be moved in order to let this boat pass over the right-of-way. As the ditch neared completion to the track, the ditch contractors asked a conference with the railway company relative to the crossing. In reply, Mr. Clayton, an assistant engineer, was sent to the point of proposed crossing, and a conference was held by him with Mr. Carter, one of the contractors, Mr. Franklin, one of the commissioners of the district, and Mr. Reynolds, its engineer. Clayton objected to the location of the ditch as planned for the district, and asked that it be changed so that it would pass under the trestle already maintained by the railway company and at right angles, and agreed it was said that if such change was made, the railway company would remove the piling from the trestle for the purpose. The arrangement was consented to and the location of the ditch was changed accordingly. Clayton made a written report to his superior officers, stating only that the conference was held and that the parties in charge of the ditch construction were agreeable to changing its location so as to cross the right-of-way at right angles under the trestle.

Shortly before the dredgeboat was ready to cross, Carter, one of the contractors, went to McGehee at the request of the general roadmaster, to confer with him and other officials of the railway relative to the time and manner of crossing. The testimony is in conflict as to what was said at the time about removing the piling, but

Carter testified that they were talking about the piling, and he told them that it was out of the question for him to pull it, for he could do nothing with it, and the officials said that they would send the wrecker. It was agreed at this conference that the dredgeboat should be let through the railroad bridge on Sunday, March 30.

On that day, the railway company sent a wrecking crew and a bridge gang to the bridge where the ditch was to cross the railroad. The railroad employees under the direction of the superintendent of the bridge and building department removed the track, and then work was begun to take out the piling. The testimony is in hopeless conflict about its removal. It appears that the dredgeboat crew dug the dirt away from the piling and the wrecking crew of the railroad attempted to pull it out, and succeeded but poorly. Sometimes, the piling would break, and oftener the chains around them. After the work had continued for some time, and not much headway had been made, the chains and piling having broken so often, the superintendent of the bridge and building department suggested that dynamite should be used. The testimony is in sharp conflict as to who used the dynamite. Mr. Marel Franklin testified that Mr. Land, the superintendent of the bridge and building department of the railway company, asked for dynamite, and also to know if there was any one who could shoot it, and that he (Franklin) procured the dynamite for him, and also at his request, called for a negro in the crowd, who prepared the charge and fired it. Franklin said that one of the railroad men asked for dynamite, whom he afterward identified as Mr. Land. ''He asked me if we had any, and I said we had some on the ditch, and he said, 'Can you get it?' and I sent a negro down to get it for him. The negro put it at the side of the track at the north end of the trestle and told him it was there. I saw the charge fixed there. They were endeavoring to get the canal through the railroad. The railroad company had been working at that job prior to the dynamiting; they had been trying to pull the piling out with the wrecker. The negro was doing the

work of preparing the charge under the supervision of the railroad company. I don't know who employed the negro; he was working for the railroad company that day, but before that he had been working for Mr. Carter. I suppose that the negro did the work under the direction of the bridge foreman." He said further that Mr. Land seemed to be bossing the job. "The. dynamite, I guess, belonged to Hahn & Carter. I had no authority to send and get it, but I did so. I did not see anybody directing the negro in fixing the dynamite. The same fellow who asked for the dynamite asked for the negro. I told him the negro was out there in the crowd. I hallooed and asked if the negro was there, and asked him to come up, that we had some shooting for him to do. The negro was in the crowd of onlookers."

Land testified that under directions from the general roadmaster, instructing him to open the bridge 510 for the purpose of letting the dredgeboat through, he instructed one of his foremen, Lamb, to go to the bridge with sufficient material to make a cord or stringer to carry trains across. That he went down there about 10 o'clock Sunday morning, and took the deck off the bridge. "After we got through our work, they made two or three attempts at pulling the piling, and could not do anything with it; the dredge men were trying to get the piling out. They were trying to dig it out and lift it with the shovel. After they pulled and pulled, I think I made the remark that if I was engineering that thing, or words to that effect, I would put dynamite in there. The remark was made to everybody around there generally. They placed dynamite in there; some colored man put it there. He was not working for the railway company. I did not know him. I had nothing to do with the dynamiting. I had nothing to do with the removal of the piling. The wrecker had already pulled some of the piling, and broke some chains in pulling it. I don't remember about getting angry about not being able to pull the pilings. I think I said that if I was managing or running the thing, I would get some dynamite. I disclaim being manager.

As far as I know, the drainage people were managing; it was their business. I think they put the negro to shooting the dynamite. We were trying to help them out. I suggested that they blow them out as a matter of accommodation. I saw the negro place the dynamite.''

The drainage contractors and their crew testified that it was the railroad's business to remove the piling, and that their crew had nothing to do with it at all, and were only assisting in its removal for accommodation to the railroad company and to expedite the work, and the railroad employees swore also that it was not their business to remove the piling, that they did not undertake to do it at all, and what work they did in this connection was done to accommodate the dredging outfit and facilitate the work.

Several witnesses, who did not belong to either crew, testified that both the ditch crew and the railroad company were working together in removing the piling, the dredgeboat crew digging the dirt away from the piling, and the railroad wrecking crew pulling and attempting to pull them out with the wrecker. Some of them say that Land, the railway bridge superintendent, appeared to be bossing the job.

There was testimony introduced, which was objected to, that Clayton, the railroad engineer, in the conference about crossing the railroad track with the ditch, suggested the change in the route of the ditch, and that it cross the track at right angles under the old trestle, and that the railroad company would remove the piling if this plan was agreed to. The railroad officials, having the authority to make such an agreement, denied any authority of Clayton to make an agreement of the kind, or that one had been made, and his written report, suggesting that it was agreeable with the drainage contractors to cross the railroad right-of-way under the trestle, was read and contained no suggestion that the railroad company was to remove the piling because of the change.

The negro used a piece of steel pipe in fixing the charge of dynamite, and when the explosion occurred, it

was hurled two or three hundred yards, struck through the edge of the roof of a negro cabin, and struck the little negro who was playing in the yard, fracturing his skull so that his brains oozed out. He suffered for several weeks, and though apparently well now, he seems to be dull at times and a kind of stiffness comes over him. "A piece of his skull is gone and the membrane and skin are bulging, creating a hernia at the point of fracture." Doctor Breathwitt said: "There is no muscular tissue over this point from which this bone has been removed, and its thinness is almost alarming to feel. There is scar tissue there. It is not true skin. The hernia is here (indicating). You can see it pulsate every time the heart beats. Here is the depressed fracture back of it. The covering of the brain there is perhaps one-sixty-fourth of an inch. If the head were held down, it would make more of a hernia. That injury is necessarily permanent. A part of the skull is entirely gone. The skull will never grow over that point. There may, and could easily come about, an irritation of the membranes here, or, as they come in contact here, producing an inflammatory adhesion of cystic condition, either one of which would prove fatal. The decided thinness of the covering necessarily carries with it a hazard. It is a constantly dangerous menace to the child."

The court instructed the jury, and it returned a verdict for $3,000 damages against the railroad company for the appellee, and from the judgment it appeals.

*E. B. Kinsworthy, R. E. Wiley* and *T. D. Crawford,* for appellant.

1. It is error to submit to the jury issues upon which there is no evidence to support a finding. 63 Ark. 177.

2. If the job was Hahn & Carter's, they had control of the manner of doing the work, and were liable. *"Respondeat superior."* 105 Ark. 477; 156 N. Y. 75.

3. The railroad company was not required to remove the pilings or soil in order to permit the passage of the dredgeboat. It was required to build its own bridge

and track after the ditch was dug. 200 U. S. 561, L. Ed. 596.

4. The facts are undisputed and a verdict should have been directed for appellant.

*Coleman & Gantt,* for appellee.

1. There is no error in the court's charge. Where an act complained of was incidental to the discharge of the functions covered by the servant's general authority, the master can not avoid liability on the ground that he did not specifically authorize the commission of that particular act. 6 Labatt, Master and Servant, § 2277; Wood on Master and Servant, § 559.

2. There is ample testimony to justify the jury in finding that the explosion was incidental to the work of appellant's employees. Wood on Master and Servant, § 585.

3. Absence of negligence on appellant's part would not excuse it from liability if it committed the act. 55 N. E. 923. One who aids or co-operates with another in a trespass is liable. 38 Cyc. 1038-41; 15 Ark. 452.

4. The company was liable for the acts of its employees even though contrary to its instructions, if within the scope of their employment. Labatt on Master and Servant, § 2277; 21 Am. Rep. 597; 113 S. W. 429; 50 Am. Rep. 102; 11 *Id.* 405; 7 Id. 293; 99 Ind. 519; 50 Mo. 104; 134 N. W. 578.

5. One who causes dynamite to be exploded in the performance of a lawful undertaking whereby one who is lawfully in a place where he had a right to be is injured is guilty of trespass and liable. 2 N. Y. 159; *Ib.* 163; 35 *Id.* 520; 58 *Id.* 416; 67 *Id.* 267; 55 N. E. 923; 20 S. W. 435; 48 So. 374; 55 S. E. 778; 935 W. 853.

6. The doctrine of *res ipsa loquitur* is peculiarly applicable here. 86 Ark. 76; 127 La. 309; 53 S. E. 575.

KIRBY, J., (after stating the facts). The appellee's right to recover does not appear to be seriously controverted, but appellant contends strenuously that it is not liable for the injury. It insists that the testimony of the

witnesses relating to the conference with Clayton and the alleged agreement by him for the railroad company to remove the piling and allow the dredge boat to cross under the trestle, if the ditching contractors would change the line of the ditch to a right angle and cross there instead of as surveyed, was incompetent and prejudicial. It is true the officials of the railroad company, having the authority to make such an agreement, testified that Mr. Clayton, the engineer who held the conference with the ditching contractors relative to the crossing of the railroad track, was without any authority to agree for the railroad company to remove the piling in consideration for having the ditch or canal put through the railroad right-of-way at right angles rather than as planned, but all admit that the conference was held and that Clayton reported that the ditching contractors had agreed to the suggestion of putting the ditch or canal through the right-of-way at right angles and under the trestle. In any event, on the day which was agreed upon by the general superintendent, at McGehee, with Mr. Carter, of the ditching contractors, Sunday, March 30, the railroad company had its wrecking and bridge crews on hand to assist in the crossing of its track by the dredge boat. It removed the deck of the bridge, and, in fact, engaged under the direction of its superintendent of the bridge and building department in helping to remove the piling with its wrecking outfit, and it is not material whether it had agreed to remove the piling or not, since it was there engaged in the work. Both the defendants, Hahn & Carter and the railroad company, were engaged in the work of removing the piling at the time of the explosion and injury to the appellee, and both deny having caused it. Each insists that it was the other's duty, and that the other alone was engaged in removing the piling, and that it was assisting for accommodation purely.

(1) It does not appear to us important whether there was an agreement on the part of the railroad company to remove the piling or not, for it sent its bridge and wrecking crew out there for the purpose of allowing the dredge-

boat to go through, and these crews were engaged in the actual work of removing the piling, and it was within the scope of their employment to use any method chosen by them as best suited for the purpose, and whether the railroad company agreed beforehand to remove it or voluntarily undertook to do it after it became apparent that it was necessary to facilitate the work, can make no difference in appellee's right to recover, if they were responsible for the wrongful act which caused his injury.

(2)    Mr. Land, the railroad company's superintendent, admits that he suggested that dynamite should be used, and, although he denies having directed its use, no one else suggested it, and Franklin swears that Land asked for the dynamite, which he procured for him, and then asked if he could get some one to shoot it, and that Franklin, at his suggestion, called for Jones, the negro shot-firer, who "was standing in the crowd of onlookers with his Sunday clothes on," to come and do the shooting. It is undisputed that Jones took the dynamite and prepared the shot that caused the injury, with the help of another negro, and fired it. Whose servant was he? He had been shooting dynamite for Hahn & Carter for some days before this, and afterward he was in their employ, but these facts alone could not make them responsible for the injury resulting from the explosion. The negro Jones did not volunteer to use the dynamite, took it after it had been procured at the request of the bridge superintendent, and also was asked to shoot it at his request. Franklin's statement was denied by Land, and it was the province of the jury to decide the question, and they could have found that the railroad company was engaged in removing the piling whether on its own account or in assisting Hahn & Carter to facilitate the passing of the boat through its right-of-way, and that the dynamite was exploded by the direction of its superintendent, and that it was liable for the injury caused thereby. The man who fired the dynamite being at work under the direction of the railroad company at the time determines its liability. *Arkansas Natural Gas Co.* v. *Miller,* 105 Ark. 477.

Instruction numbered 4, complained of, told the jury that if the person in charge of the railroad employees and machinery undertook the work of removing the piling, and in so doing used dynamite by the direction of the servant of the railroad company, they should find it liable; but if the jury did not find this fact, as it could have done from the testimony, then to find in favor of the railroad company, and thus submitted fairly the issue to the jury. Under the circumstances, it could not have been influenced, and it did not make any difference whether there was an agreement by Clayton, the engineer of the company, with Hahn & Carter, the ditch contractors, to remove the piling or not, because its servants were actually engaged in the work of removing it, which was within the scope of their employment, and used the dynamite, the explosion of which caused the injury, in furtherance of that purpose.

Other questions are raised, but we do not find it necessary to discuss them. We find no prejudicial error in the record, and the judgment is affirmed.