### DELAMAR & ALLISON v. WARD.

Opinion delivered July 6, 1931.

*Frauenthal, Sherrill & Johnson,* for appellants.

*McRae & Tompkins,* for appellee.

SMITH, J. State highways numbered 4 and 53 cross each other at right angles in Nevada County, and both of them were being improved by spreading gravel on them. While the work of hauling and spreading the gravel was in progress, John Ward, Jr., who was thirty-one years of age, drove a Ford touring car over the point of intersection of these roads. His car had the back seat cut away and the entire top removed so as to make a light truck which he called a "Hoopie." His car truck had only one seat, and seated thereon with him were his

father, John Ward, Sr., who was sixty-four years of age, and Henry Lewis, his father-in-law, who was sixty-eight years old.

Between nine and ten o'clock on Saturday morning, October 11, 1930, Buster Westmoreland drove a truck loaded with gravel across the intersection of these roads and a collision occurred with the car driven by Ward, which resulted in a serious injury to John Ward, Jr., and in the death of his father and father-in-law. Suits were brought by Ward, Jr., and by the administrators of the estates of his father and father-in-law to compensate these injuries. These cases were consolidated and tried together.

There was a verdict and judgment for John Ward, Jr., in the sum of $5,000. There was a verdict and judgment in the Lewis case for the benefit of the widow in the sum of $2,500, but no verdict was returned in favor of the estate for pain and suffering. In the case of Ward, Sr., there was a verdict in favor of his widow in the sum of $2,000, and a verdict and judgment for the benefit of his estate in the same amount.

The truck driven by Westmoreland was owned by A. C. and Charles Bratcher, and they were made defendants, but the suit was dismissed as against them before the trial. Delamar & Allison were original defendants, and were sued upon the theory that Westmoreland was their servant at the time of the collision, and that his negligence had caused the collision.

A reversal of these judgments is prayed upon the following grounds: (1) That the relationship of master and servant did not exist between Westmoreland and Delamar & Allison; (2) that no negligence was shown upon the part of Westmoreland; (3) that the injury was caused by the contributory negligence of the occupants of the automobile; (4) that error was committed in making proof that Delamar & Allison carried indemnity insurance; and (5) that error was committed in submitting the issue whether either deceased had suffered conscious

pain and suffering, and in permitting the estate of Ward, Sr., to recover on that account.

The most difficult question in the case is the one first stated, that is, whether the relationship of master and servant existed between Westmoreland and Delamar & Allison.

Upon this question it may first be said that no objection is made to the instructions which submitted this issue to the jury, and it remains therefore only to determine, in the decision of that question, whether the evidence was legally sufficient to support the finding of the jury that the relationship of master and servant existed, and, in the decision of that question, we must, of course, view the testimony in the light most favorable to the plaintiffs.

This testimony may be summarized as follows: The State Highway Department was spreading gravel upon a force account, and was shipping by railroad freight the gravel so used. Delamar & Allison suggested a cheaper gravel might be obtained by hauling it from local gravel pits, and they entered into a contract with the highway department to furnish and deliver the gravel. Their contract required them to deliver it on the roads. Delamar & Allison employed a large number of persons, about 302 in fact, to haul and deliver this gravel, and all of them were paid the same price for this service. No one hauled gravel until their trucks had been employed and put to work by Delamar & Allison.

Allison testified that Bratcher applied to the highway department engineer for employment, but Bratcher denied this. One of these trucks was driven by Buster Westmoreland. The gravel was purchased from Clifton Graham, who stayed in the pits to keep check on the amount of gravel hauled, but the undisputed testimony appears to show that Delamar & Allison were in control of the pits, and that the trucks were loaded by their employees.

A number of the truck owners testified that they were paid by Delamar & Allison, after one per cent. of the

amount due them had been deducted for insurance, at least they were advised that the deduction was made on that account. Delamar & Allison denied that the deduction was made for that reason, but testified that this one per cent. was deducted on account of the advance payment, and that when the truck owners waited until the regular pay day no deductions were made.

There was testimony to the effect that a number of the laborers who were employed to load the trucks in the gravel pits were discharged for shooting dice, and that this was done with Allison's approval. There was testimony to the effect that certain of the truck drivers drove off the usual road through the field of a colored man, and that Allison stopped this, and that Allison also directed certain of the drivers where to deliver the gravel, and that he also stopped some of the drivers from driving over loose gravel.

A number of placards were furnished the truck drivers to place on the trucks reading as follows: "No passengers allowed on this truck. Delamar & Allison." No placards were placed on the Bratcher trucks, but this was because the supply of placards was exhausted. It was testified on behalf of Delamar & Allison that the placards were placed on the trucks under the direction of the supervising engineer of the highway department.

There was a controversy as to whose servant the man was who supervised the dumping of the gravel. The drivers obeyed the directions given by the dumper at the end of the haul. Unquestionably the dumper was obeying the orders of the engineer of the highway department as to the places where and the manner in which the gravel should be dumped, but in so doing he was enabling Delamar & Allison to perform the essential part of their contract by dumping the gravel as their contract required them to do. The dumper was therefore engaged in the performance of a necessary part of the contract of Delamar & Allison, and the jury might have found that he was loaned to Delamar & Allison for a particular service and was therefore their servant. *Arkansas Natural Gas*

*Co.* v. *Miller,* 105 Ark. 477, 152 S. W. 147; *St. L. I. M. & S. R. Co.* v. *Washington,* 114 Ark. 192, 169 S. W. 770; *Arkansas Logging Co.* v. *Martin,* 116 Ark. 325, 173 S. W. 184; *Dubisson* v. *McMullin,* 163 Ark. 191, 259 S. W. 400.

As a matter of fact, the haulers did not require any considerable control. Their trucks were loaded in the pits by men who were admittedly the servants of Delamar & Allison, and the dumper told the men where and how to dump the gravel.

Delamar & Allison testified that they did not in any case employ the driver of any truck, and that these drivers were employed and paid by the truck owners, and that they had no control over any of the drivers and were not concerned as to the manner in which they did their work, and were interested only in the result thereof. But this was the principal question of fact in the case, and we think the testimony was sufficient to support the finding that Delamar & Allison employed the trucks, and none were engaged except those employed by them, and the right to discharge necessarily implied, and that they had the right to direct and control the drivers of the trucks and had exercised that authority, although but few directions were required.

We conclude therefore that the testimony warranted the finding that there were not three hundred independent contractors engaged in hauling the gravel, but that all the drivers were employees of Delamar & Allison, and that the relation of master and servant existed between Westmoreland and the other truck drivers and Delamar & Allison. *Ellis & Lewis* v. *Warner,* 180 Ark. 53, 20 S. W. (2d) 320; and *Ellis & Lewis* v. *Warner,* 182 Ark. 613, 32 S. W. (2d) 167.

Upon the question of the negligence of Westmoreland, and that of the contributory negligence of the occupants of the automobile, but little need be said. Westmoreland was a boy twenty years old, and had hauled only one load, the day before the collision, and was hauling his first load on that day. He was late reporting for work, and a son of one of the Bratchers had taken his

place, and the jury might have found that Westmoreland was trying by speed to make up for his lost time. On account of the work in progress at the crossing, the view of the drivers of both the truck and the car was obstructed.

Ward testified that he was driving up grade with his car under control, while Westmoreland drove into the intersection like a cyclone, and it appears to be undisputed that when the truck struck the car it turned completely over the car and covered the occupants thereof with the gravel. Westmoreland admitted that he was driving twenty or twenty-five miles an hour, but he had stated to the sheriff prior to the trial that he did not think he was driving over thirty or thirty-five miles an hour. In other words, the case presents the usual conflict in the testimony which is found in nearly all collision cases as to whose negligence caused the collision. This question was submitted to the jury under instructions which are not questioned as being correct declarations of the law, and the question is concluded by the verdict of the jury.

It is earnestly insisted for the reversal of the judgment that the attention of the jury was repeatedly and unnecessarily called to the fact that Delamar & Allison carried indemnity insurance, although they testified that they carried no insurance covering the collision out of which this litigation arose. On the other hand, it is insisted that a deduction of one per cent. was made to cover such insurance.

In overruling the objection to this testimony when it was first offered the court said: "Gentlemen of the jury, the testimony of the witness, Mr. Pruitt with reference to what Mr. Allison told him in Arkadelphia about the reason for withholding a certain part of his pay may be considered by you gentlemen for one purpose alone, and for no other purpose. One of the questions in this case, gentlemen, is whether or not Delamar & Allison, the defendants, were exercising any control over the operation of the truck which figured in the accident or

injury in this case. This testimony is submitted to you as a circumstance only for you to consider in determining whether or not Delamar & Allison, the defendants, had any control or dominion over the truck which figured in the case that you are now trying, and you will not consider that testimony, gentlemen, for any other purpose, and it would be highly improper, gentlemen, and would not only be improper but would be absolutely unlawful for the jury to be influenced in any manner or degree by any statement with reference to insurance in the case, or what Mr. Pruitt said about it. The only purpose for which that is submitted to you is to assist you, if it does assist you, in arriving at a determination as to whether or not Delamar & Allison had any control or dominion over the truck driven by Buster Westmoreland at the time of this collision.'' The same admonition was given in the instructions which finally submitted the case to the jury.

We think no error was committed in this respect. The fact that Delamar & Allison were insured, if it was a fact, against liability for injuries committed or damage done by the truck drivers was a circumstance to be considered in determining whether the truck drivers were their employees or were independent contractors. So also, would be the fact, if it was a fact, that Delamar & Allison deducted one per cent. to pay for such insurance, whether they actually carried the insurance or not.

No complaint is made of the amount of the verdict in the case of John Ward, Jr., or that in the Lewis case, but it is earnestly insisted that no verdict should have been returned in the case of Ward, Sr., for the benefit of his estate, for the reason that the undisputed testimony shows that he died without enduring conscious pain or suffering.

Upon this question the testimony is to the following effect: Dr. Hirst, the coroner, viewed the bodies of both men after their death, and testified that ''both men were broken up pretty badly, fractured arms and legs, and one was crushed in the chest, and one I remember had a frac-

ture I think about his ear, a place almost large enough to put your fist in. The skull was crushed entirely in.'' The positive opinion was expressed that this man, and the coroner was not sure which one he was, had not suffered any conscious pain. He did not examine the other man very closely, although both men were lying on a stretcher in the undertaking parlor. The coroner also expressed the opinion that one whose skull was fractured by a blunt instrument was much more likely to be rendered unconscious than was one whose brain had been pierced by a sharp instrument like a knife.

John Ward, Jr., testified that the collision rendered him unconscious for a few minutes, and that when he regained consciousness his father was breathing and struggling and making curious noises, and that he saw him try to raise his right arm; that he called to his father and ''tried to arouse him, but I did not get an answer, just a curious racket.'' Ward, Jr., was picked up and carried away about ten minutes after the collision, and his father was still alive, but he died a few minutes later.

The coroner testified that any struggle or movement is some slight evidence that there might have been conscious pain. These questions were asked him and answers given: ''Q. (By plaintiff's counsel.) Dr. Hirst, there is some proof in here that Mr. Lewis, who was not the man that was injured on the forehead, was seen, nine minutes after the collision, approximately, to try to move up his arm, which was badly broken, but he was seen to try to move up this arm; wouldn't you say to the jury that was some evidence that the man may have suffered some conscious pain after that time, or that length of time? A. Well, it might and might not be. If that was a co-ordinated movement, if he moved his arm and at the same time tried to move his head to see his arm, I think so. Q. Suppose after nine minutes they were breathing, and the breathing had not grown weaker, would that cut any figure in your opinion? A. Well, it might.''

It will be remembered that there was no recovery for pain and suffering on behalf of the estate of Mr. Lewis.

The undertaker, who appears also to have been a doctor, testified that the heads of both men were badly crushed, and that the injuries to each had penetrated the skull, and that "the skulls were fractured through on both of them," and they had apparently received a blow on their skulls, which appeared to be crushed and mashed, and that the injuries were not of a character to have been inflicted by a sharp or pointed instrument. This witness answered questions as follows: "Q. Where were those fractures, doctor, as to whether they were at the front of the skull or at the back of the skull? A. Both. Q. They were fractured all the way around? A. Yes. Q. Could you tell from the outside whether there was any damage to the brain on the inside? A. Well, I could. There was a hole in the base; you could see the brain was damaged. Q. Well, how? Just describe that damage to the jury. A. Well, just the head was mashed so that you could just mash against it and feel the bone crush, you know. Q. Well, isn't that always true with a fracture— can't you press any fracture and feel a little give? A. I don't know that that is true with every fracture, no, sir. It might be very small and just be a crack that you couldn't feel, but these were crushed to where you could feel from the outside and tell. Q. Which one of the men was hurt the worst, or had the greater injury to the skull? A. It seems to me like it was Mr. Ward now. It is kind o' hard for me to separate the two just offhand." And on his redirect examination he further testified as follows: "Q. Which one had the fracture, the crushed skull on his forehead? A. The scalp was cut on his forehead? Q. Yes, sir. A. It seems to me like that was Mr. Ward. Q. And Mr. Lewis' injury was on the back part of the head? A. Well, principally the back part of his head."

A Dr. Buchanan testified as an expert in behalf of the plaintiffs, and stated that not all brain injuries caus-

ing death produced unconsciousness, but he answered questions as follows: "Q. Now, if a man had received an injury to his skull that penetrated his skull, from some heavy blunt instrument, and after he received the injury he only lived for a few minutes, that the injury was of sufficient force and severity to cause his death in just a few minutes, would you say that man was rendered unconscious at the time he received the injury? A. You mean to say all of his trouble was with his head? Q. No, but the worst part of his injury. He might have received minor injuries, maybe a broken arm or hand? A. If his trouble, all of it, was his head, why I would say that he wasn't conscious. If all of his injury was his head, and he was dead in 15 minutes, I wouldn't say but what he was."

We conclude, from this testimony, that there is no substantial basis upon which to sustain the verdict and judgment for conscious pain and suffering in the case of Ward, Sr. The injury to him and to Mr. Lewis appears to have been very similar, and no recovery on this account was had in the Lewis case. The skulls of each appear to have been not only fractured but to have been crushed. The younger Ward was unable to arouse his father or to obtain recognition from him, and there is no testimony that the elder Ward said or did anything indicating consciousness. *St. L. I. M. & S. Ry. Co.* v. *Dawson,* 68 Ark. 1, 56 S. W. 46; *St. L. I. M. & S. Ry. Co.* v. *Stamps,* 84 Ark. 241, 104 S. W. 1114.

The judgment for pain and suffering must therefore be set aside; in all other respects the judgments are affirmed.