BEN M. HOGAN COMPANY, Inc., ET AL *v.*
WILL E. NICHOLS, ET AL

5-6168                                         496 S.W. 2d 404

Opinion delivered July 2, 1973

*Bethel, Calloway & Robertson,* for appellants.

*Sam Sexton Jr.* and *Douglas O. Smith,* for appellees.

JOHN A. FOGLEMAN, Justice. We have concluded that this $175,000 judgment against Ben M. Hogan Company,

Inc. and Vernon Stewart, appellants herein, for personal injuries sustained by Will E. Nichols must be reversed. Nichols was the driver of a water truck which collided virtually head-on with a dump truck owned by Jack Steele and driven by either Steele or Joe Pat Cumbie. The collision occurred on November 20, 1970, during the course of construction of Interstate Highway No. 40 in Franklin County. Nichols suffered severe, painful and disabling injuries. He sued Hogan, and Hogan's employee Vernon Stewart, alleging that Stewart's actions in driving a cement mixer truck were a proximate cause of the collision and his resulting injuries. While appellants assert that the jury awarded excessive damages, we do not reach this point, because we find procedural errors which necessitate a new trial, and will not speculate as to the result of that trial.

Specifically, we find reversible error in the admission of the testimony of Dr. Robert G. Fisher, the liability insurance contract between Hogan and Aetna Life and Casualty Company and certain clauses in the contract between the Arkansas Highway Department and Ben M. Hogan Company, as well as in restriction of the cross-examination of Joe Pat Cumbie. Other points asserted by appellants which are based upon matters likely to arise on retrial will be discussed.

After all other testimony in the case had been completed, Dr. Fisher appeared as a witness for appellee Nichols. This physician is a neurological surgeon residing in Oklahoma City, Oklahoma, who recited impressive credentials as an expert in his field. On voir dire examination it was disclosed that he first saw Nichols on October 15, 1971, at the request of Nichols' attorney, Sam Sexton, and that he took the patient's history and obtained information as to his symptoms from Nichols and Nichols' wife, supplemented by a closing of gaps or inadequacies in the narrations given by this couple through medical records afforded by an attorney from Mr. Sexton's office. The doctor's entire examination was conducted in the presence of Nichols' wife and this attorney, both of whom, he stated, were present throughout the examination, which consisted of inquiries by the doctor to ascertain Nichols' complaints, current symptoms and capabilities and the nature and effects of his injury. The

doctor said that the attorney did answer inquiries made during the discussion of these matters, but that Mrs. Nichols answered more. Voir dire also revealed that, even though it would be possible for this witness to express an opinion as to diagnosis and prognosis relative to Nichols' injuries by filling gaps in Nichols' memory with hospital history of notes of treating physicians, Dr. Fisher did, in fact, consider the history given him as an extremely important feature in his ultimate findings. The witness also stated on voir dire that Nichols was referred to him by Sexton, partially for testimony, and partially in the interest of confirmation of a previous diagnosis and any treatment that might be necessary. When asked whether he had intended to perform any treatment or to simply pass suggestions he might have along to attending physicians, Dr. Fisher replied that he thought that, ethically, it would be his role to do the latter. He neither performed any treatment, nor had any suggestions for the attending physician.

This testimony conclusively establishes that Dr. Fisher was not a treating physician, but that he occupied the exclusive role of a medical expert witness, giving opinion testimony, the admissibility of which must be determined on that basis. The doctor was permitted to testify as to matters of history of symptoms and injuries related to him by those present at the examination and reflected by medical records furnished him, over the objections of appellants. Appellants objected to any statement of medical opinion, diagnosis or prognosis, based upon history secured from the patient, his wife and attorney, on the ground of hearsay, to repetition of this history by the witness, and to the expression of opinions based upon records and reports of other physicians. Neither Nichols nor Dr. James A. Brown, his attending neurosurgeon, testified.

The general rule, supported by the weight of authority, is that statements by an injured or diseased person as to his current conditions and symptoms, or as to past conditions and symptons, made to a physician conducting an examination for the purpose of qualifying as an expert witness, and not for treatment, are inadmissible. See Annot. 67 A.L.R. 10, 15 et seq., 22 et seq. (1930); 130 A.L.R. 977, 978, et seq., 982 et seq.; 65 A.L.R. 1217, 1219

(1930); 51 A.L.R. 2d 1051, 1065; 32 C.J.S. 357, Evidence § 546 (94).[1]

We have sustained the admission of expert opinion as to prognosis of an injury based upon testimony given at the trial by another physician as to disclosures from x-ray pictures made by the other physician. *Missouri Pac. R. Co. v. Sorrells,* 201 Ark. 748, 146 S.W. 2d 704. A medical expert may also base his opinion upon testimony as to symptoms of the injured party given by that party and his attending physician. *Safeway Stores, Inc. v. Ingram,* 185 Ark. 1175, 51 S.W. 2d 985. But an expert medical opinion based entirely upon a review of the record of a medical examination and a diagnosis by another physician is not admissible. *Southern Nat. Ins. Co. v. Heggie,* 206 Ark. 196, 174 S.W. 2d 931. The proper rule seems to be that the medical expert should not be allowed to base his opinion upon matters that are neither within his personal knowledge nor in evidence in the case. See *Wild v. Bass,* 252 Miss. 615, 173 So. 2d 647 (1965).

Since Dr. Fisher was not present at the trial, did not hear the testimony and did not base his opinion upon the testimony given at the trial, and since no hypothetical question embracing facts shown by the evidence was addressed to him, his testimony cannot be held admissible under the rule as to expert witnesses, stated in *Polk v. State,* 36 Ark. 117; and followed in *St. Louis, I. M. & S. Ry. Co. v. Williams,* 108 Ark. 387, 158 S.W. 494; *Ringlehaupt v. Young,* 55 Ark. 128, 17 S.W. 710; and *Arkansas Baking Co. v. Wyman,* 185 Ark. 310, 47 S.W. 2d 45.

The basic rule for the admission of expert medical testimony was stated thus in *Polk:*

If the expert has been present, and heard all the evidence as to the symptoms and appearances, detailed upon the trial, he may give his opinions upon the facts so stated, *if they be found true by the jury,* but

---

[1]For further discussions of the general rules as to expert witnesses, see 31 Am. Jur. 2d 537, et seq., Expert and Opinion Evidence, §§ 36, 37, and as to Medical Experts, see 31 Am. Jur. 2d 634, et seq., Expert and Opinion Evidence, §§ 108, 109, 110.

can not, himself, judge of their truth. If he has not been present and heard them they may be repeated to him, in the presence of the court and jury, and his opinion concerning them required upon the same supposition of their truth. But, in either case, the opinion is upon a hypothetical state of affairs, and its value depends upon the view *the jury* may take of the truth of the facts, to which witnesses have sworn. It can not be based upon any facts which the expert may have heard outside, and may believe to be credible; and, if based upon his own knowledge of particular facts, he should, himself, detail the facts, and give his opinion thereon.

Consistent with the general rule, we have held that where there were no objective symptoms, the opinions of physicians as to the extent of injuries, based on exclamations and other indications of pain and the plaintiff's inability to handle himself, were properly admitted in evidence, but that an opinion based upon self-serving declarations is inadmissible. *Biddle* v. *Riley,* 118 Ark. 206, 176 S.W. 134, L.R.A. 1915F 992. In *Biddle,* we quoted the rules as follows:

"A medical expert may base his opinion upon a clinical history of the case under consideration, and in order to make his testimony intelligible, he may testify to the observations that he made, and also as to what his patient said to him in describing his bodily condition and the character and manifestations of his sickness, pains, etc. The reason for this rule is that the physician must oftentimes of necessity take into consideration such statements in reaching a conclusion as to the physical condition of the patient, and the nature and extent of his malady or injury; and hence the rule being founded on such necessity, it has been declared that it must be applied with caution, and not extended beyond the reason of necessity upon which it rests. It has been declared, however, that the mere statements made by a person as to his sufferings, pain, etc., which statement was made for the sole purpose of furnishing the expert with information on which to base an opinion, is not admissible, and that the witness, in testifying to what he has heard and observed, is confined to exclama-

tions, shrinkings and other expressions which appear instinctive, intuitive and spontaneous." 5 Encyclopedia of Evidence, p. 608.

The rule on the subject is also stated by Mr. Jones, in his work on Evidence (2 ed.), section 349, as follows: "Whenever it becomes material to show a person's condition of health, or motives, or state of mind, such person's declarations may often be received in evidence for such purpose, provided the requisites already pointed out are complied with; and it appears that such statements are spontaneous and undesigned, and that they illustrate the facts which are the subject of inquiry. In some of the decisions, the utterances are limited to groans and exclamations, and other involuntary exclamations of pain. But in others assertions and complaints as to present feeling are received more liberally. But on the grounds already stated, such declarations are confined to the present condition of the declarant. * * * Anything in the nature of narrative or statement is to be carefully excluded; and testimony is to be confined strictly to such complaints, exclamations and expressions as usually and naturally furnish evidence of a present existing pain or malady."

See also, *Subiaco Coal Co.* v. *Krallman,* 143 Ark. 469, 220 S.W. 664.[2]

We have said that such an expert cannot be asked his opinion upon a disputed fact question unless he is personally acquainted with the material facts, unless he was present and heard all the testimony or unless the inquiry is made by a hypothetical question. *Arkansas Baking Co.* v. *Wyman,* 185 Ark. 310, 47 S.W. 2d 45. We have also held that even a treating physician should not be permitted to repeat a self-serving declaration of a patient about his present conditions and symptoms made during a pre-trial examination sometime after the injury, when the

---

[2]The decision in *Seaman Store Co.* v. *Bonner,* 195 Ark. 563, 113 S.W. 2d 1106, is not contrary to the general rule. There, the examining physicians made tests to determine the accuracy of his patient's statements of the history of his case and satisfied themselves that the results verified the patient's subjective statement of symptoms, pains and aches. No contention was made that this testimony was improper.

doctor himself had no knowledge of the matter other than the patient's statements. *St. Louis, I. M. & S. Ry. Co.* v. *Bostic,* 121 Ark. 295, 180 S.W. 988, 181 S.W. 135.

The Arkansas cases above cited are in harmony with the general rule established by the great weight of authority, that testimony of the type to which appellants objected is not admissible.[3]

After an extensive review of authorities, the United States Circuit Court of Appeals for the Eighth Circuit, in a diversity case tried in the Western District of Arkansas, held that a medical expert neurologist, who was not a treating physician, but who made his examination of the injured plaintiff for the purpose of qualifying himself to testify at the trial should not have been permitted to relate the statements made to him by the injured party as to the accident or as to his feelings and sensations subsequent thereto, or to state his opinion based partly upon the statements of the plaintiff and partly upon his examination. *Lee* v. *Kansas City Southern Co.,* 206 F. 765 (1913).[4]

A case remarkably similar to the one at hand, *Goodrich* v. *Tinker,* 437 S.W. 2d 882, was decided by a Texas Court of Civil Appeals in 1969. The Texas court recognized the well established rule that a doctor, who is not a treating physician, and who examines the patient for the purpose of making a report or testifying in court, if necessary, cannot base his opinion testimony as to the condition and prognosis of the injury to the patient upon the subjective complaint and history of the case, but must base it upon a study of objective symptoms and such objective evidence as x-rays. The history there related by the patient was, of course, under the circumstances, self-serving and hearsay. The Texas court, however, declined to decide the question solely on a decision whether the physician was a "treating" doctor or an "examining" doctor. It chose to base its decision upon the underlying reason for the rule, i.e., that expert medical opinion must be formed from facts found or known to the witness from treatment or examination.

---

[3] See annotations and text references heretofore cited.

[4] The diagnosis in that case was traumatic neurasthenia, a condition of nerve exhaustion, or lack of nerve strength caused by injury.

We need go no further on this appeal than the Texas court went. The opinion testimony of Dr. Fisher based in substantial part upon self-serving and hearsay statements should have been excluded, and he certainly should not have been permitted to relate to the jury the statements made to him during the examination. We agree with other jurisdictions that such testimony is especially prejudicial where, as here, the treating physician did not testify. See, e.g., *Briney* v. *Williams*, 143 Ind. App. 691, 242 N.E. 2d 132. See also, *Chicago & N.W. Ry. Co.* v. *Garwood*, 167 F. 2d 848 (8th Cir. 1948); *Holt* v. *Hartschiek*, 96 Ohio App. 491, 122 N.E. 2d 653 (1953).

Passing now to the point concerning the introduction of appellant Hogan's liability insurance policy, we find that the trial court permitted appellees to introduce in evidence certain clauses in the policy and evidence that premiums thereon were calculated, in part, on amounts paid for hire of vehicles not covered by insurance. The court also permitted appellees' attorney to state, in opening statement, that appellees would show that Hogan's liability insurance policy covered hired trucks and that Aetna Casualty and Surety Company collected a premium specifically covering Steele's truck. This was done in spite of appellants' motion in limine for an order prohibiting such evidence based upon an assertion that pre-trial depositions established the inadmissibility of the testimony and appropriate objections made and preserved by appellants. The trial court ruled that the questioned evidence was admissible insofar as the policy tended to show whether the defendants Cumbie and Steele came within the coverage of the policy or whether Aetna charged Hogan a premium for coverage of Cumbie and Steele. Whenever the question was raised, the circuit judge did admonish the jury that the testimony could be considered only for the purpose of showing what degree of control, if any, was exercised by Hogan over Cumbie or Steele and their gravel truck.

One of the critical questions of fact was whether Hogan had vicarious liability for the negligence of Cumbie and Steele. Steele was the owner and Cumbie the driver of a gravel dump truck being utilized to supply gravel for making concrete to be used on the construction job con-

tracted to Hogan by the Arkansas Highway Department. Hogan contended that Steele was an independent contractor and that Cumbie was Steele's employee. Appellees contended that both should be considered as agents, servants or employees of Hogan. There was some question as to whether Cumbie or Steele was driving the truck on the date Nichols was injured, but there was substantial evidence tending to show negligence on the part of the driver of this truck and that this negligence was a proximate cause of the collision in which Nichols was injured.

When John Gillen, auditor for Aetna Casualty Company, was called as a witness by appellees, the court directed that his examination be confined to two issues. i.e., whether there was coverage by the policy and whether there was a premium charge. During Gillen's testimony he read the following excerpts from the policy:

V. Additional Definitions

When used in reference to this insurance (including endorsements forming a part of the policy):

"automobile business" means the business or occupation of selling, repairing, servicing, storing or parking automobiles;

"hired automobile" means an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured, provided such automobile is not owned by or registered in the name of (a) a partner or executive officer of the named insured or (b) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile;

"non-owned automobile" means an automobile which is neither an owned automobile nor a hired automobile;

"owned automobile" means an automobile owned by the named insured;

"private passenger automobile" means a four wheel private passenger or station wagon type automobile;

"trailer" includes semi-trailer but does not include mobile equipment.

\* \* \*

Description of Terms Used as Premium Bases:

When used as a premium basis: \* \* \*

6. A. "cost of hire" means the amount incurred for (a) the hire of automobiles, including the entire remuneration of each employee of the named insured engaged in the operation of such automobiles subject to an average weekly maximum remuneration of $100, and for (b) pick-up, transportation or delivery service of property or passengers, other than such services performed by motor carriers which are subject to the security requirements of any motor carrier law or ordinance. The rates for each $100 of "cost of hire" shall be 5% of the applicable hired automobile rates, provided the owner of such hired automobile has purchased automobile Bodily injury Liability and Property Damage Liability insurance covering the interest of the named insured on a direct primary basis as respects such automobile and submits evidence of such insurance to the named insured; \* \* \*.

It was established through Gillen that Aetna did collect a premium from Hogan because of the hire of the truck ordinarily driven by Cumbie.

After these policy provisions and Gillen's testimony had been admitted, Hogan called the manager of Aetna's underwriting department. This witness described the hired-truck endorsement as a standard clause, used not only by Aetna but by other major insurance companies. He explained that the endorsement afforded coverage to the insured on a hired truck operated either by his own employee or by an independent contractor, but not to the driver of a truck of an independent contractor who was not an employee of the insured. He testified that it would

not have been possible for Hogan to purchase from Aetna, or any other "bureau" company, any "hired-truck endorsement" affording coverage to the insured only when the driver of a hired truck was Hogan's employee, and not an independent contractor or the employee of the latter. He referred to Paragraph II(c) of the policy provision entitled "Persons Insured" which follows:

> any other person while using an owned automobile or a hired automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, * * *.

This witness also testified that the rates for coverage of hired trucks amounted to less than 10% of the premium for owned vehicles. After this witness testified, appellant Hogan moved to strike the insurance policy and all testimony pertaining to it, and moved for a mistrial.

The entire policy was made an appellate exhibit, for the purpose of demonstrating the basis of Hogan's objection to its introduction. It contains this further pertinent provision with reference to persons insured:

II. * * *

None of the following is an insured: * * *

(ii) the owner or lessee (of whom the named insured is a sub-lessee) or a hired automobile or the owner of a non-owned automobile, or any agent or employee of any such owner or lessee; * * *.

These clauses clearly eliminated Steele and Cumbie from coverage, unless they were employees of Hogan. There was substantial evidence tending to show that Steele was an independent contractor and that Cumbie was his employee.

Evidence relating to the existence of liability insurance is ordinarily excluded because of its lack of relevance. Because of the inherently prejudicial effect of such evidence, it should only be admitted when it has some

probative value relevant to the issues. Evidence along these lines has been admitted when it tended to show facts or circumstances having a bearing upon an issue. This policy or its content could be admitted only to the extent it tends to show that Cumbie and Steele were employees of Hogan. But the policy, by its terms, does not do so. Hogan is afforded coverage regardless of its relationship with Cumbie and Steele. Cumbie and Steele would be afforded coverage only if they were employees of Hogan. Therefore, the policy of insurance and its terms had no probative value on the issue as to the relationship of Cumbie and Steele to Hogan.

We are not unmindful of our decisions in *Delamar and Allison v. Ward,* 184 Ark. 82, 41 S.W. 2d 760; *Pollock Stores Co. v. Chatwell,* 192 Ark. 83, 90 S.W. 2d 213; *Ozan Lumber Co. v. McNeely,* 214 Ark. 657, 217 S.W. 2d 341, 8 A.L.R. 2d 261; *Brown v. Keaton,* 232 Ark. 12, 334 S.W. 2d 676; and *Phillips Cooperative Gin Co. v. Toll,* 232 Ark. 236, 335 S.W. 2d 303, relied upon by appellees and, apparently, the trial court. This decision is not intended to overrule or limit the application of any of them. Each is clearly distinguishable from the case at bar and the application of any of them in this case would require an unwarranted extension of its rationale.

*Delamar* has a more nearly parallel factual background than any of the other cases. Delamar and Allison were sued by one injured by a truck owned by A. C. and Charles Bratcher and driven by Westmoreland, on the theory that Westmoreland was the servant of Delamar and Allison. Delamar and Allison contended that Westmoreland was the servant of Bratcher and that Bratcher was an independent contractor hauling gravel for use in highway construction from a pit controlled by Delamar and Allison, who had contracted to furnish the gravel to the highway department. We found no error in the admission of evidence tending to show that Delamar and Allison were insured against liability, along with evidence that Delamar and Allison withheld 1% of the amount due truck owners for insurance. There was no evidence in that case, as there is here, that Delamar and Allison were unable to obtain insurance that would protect them against liability for negligence of a driver of a hired vehicle who was their

employee without also paying for coverage as to their potential liability for acts of employees of independent contractors driving vehicles hired but to be operated by employees of the owner of the vehicle. This requirement by insurance companies is understandable in view of the fact that they may well be required in many cases to indemnify an insured for a liability imposed upon a jury fact finding that one considered by both the insured and the carrier to be an independent contractor was actually an employee. The question is more often than not one for the jury and its answer usually depends upon the drawing of fine inferences from conflicting evidence. We also think that it is significant that there was evidence in *Delamar* that 1% was withheld from the compensation due each of 302 truck owners to pay for insurance. In the first place, the withholding of premiums placed *Delamar* in that category of cases in which evidence of payment of workmen's compensation premiums is admissible to shed light on an issue of employment relationship. And then this fact could also give rise to an inference that the liability insurance coverage in *Delamar* was intended to encompass the owners and drivers of the trucks, as well as the contractor, regardless of their relationship. It is clear to us that Hogan, and Hogan alone, is the insured in this case if the vehicle owner is an independent contractor. Since under the circumstances here, the existence of insurance protecting Hogan is as consistent with one relationship as the other, it has no probative value on the issue. The application of *Delamar* should not be extended to these circumstances.

In *Pollock Stores* v. *Chatwell,* supra, the fact that the corporate defendant carried liability insurance on a motor vehicle owned by its Fort Smith manager was relevant and had probative value to show its interest in the manager's automobile, when the crucial issue in the case was whether the driver of that vehicle, a sometime employee of the company, was performing services for the company or the manager in driving the vehicle to its usual place of storage. The *Ozan Lumber Company* case related only to the probable effect of introduction of testimony which might have tended to show that the company paid workman's compensation insurance on an alleged independent contractor and his employees. In *Brown* v. *Keaton,* supra,

there was a contract under which the owner of a trailer had leased a tractor from the driver of the combined rig. We said that a provision in that contract requiring the owner to carry liability insurance with expense to be borne by the driver through deductions from weekly payments under the contract might have been admissible as bearing upon the driver's status as an employee or independent contractor. In *Phillips Cooperative Gin Co. v. Toll*, supra, we were considering a case wherein the alleged independent contractor would have been required to file evidence of liability insurance with the Arkansas Commerce Commission if he were not an employee. Since the content of the policy here had no probative value to establish the employment relationship, it should not have been admitted into evidence.

Portions of the contract between Hogan and the highway department were also admitted for consideration of the ·lationship between Hogan and Steele and Cumbie. The entire contract was admitted and the attorneys for the respective parties were given permission to call the attention of the jury to any portions they felt pertinent. This contract contained a definition of an employee as any person working on the project mentioned in the contract who was under the direction or control of, or receives compensation from, a contractor or subcontractor. A subcontractor was defined as:

> A person, firm or corporation who has written approval of the chief engineer written in the agreement with the prime contractor for the performance of any of the work included under these specifications.

Another provision had reference to subletting or assigning the contract. It read:

> The subcontractor will not be permitted to sublet, assign, sell, transfer or otherwise dispose of the contract or any portion thereof or of his right, title or interest therein to any individual, firm or corporation without the written consent of the Commission and Chief Engineer. The contractor must file with the Chief Engineer a signed copy of each subcontract with his request for approval; no approval will be

given unless the proposed subcontractor is pre-quali-
fied to bid on work offered by this department. No
subcontract, or transfer shall in any case release the
contractor of his liability under this contract and
bond.

It was shown that Hogan did not obtain approval of a
subcontract with either Steele or Cumbie. A further re-
quirement of the contract read:

2. The contractor shall perform with his own or-
ganization contract work amounting to not less than
fifty percent of the original total contract price, ex-
cept that any items designated by the State as "Special-
ty Items" may be performed by subcontract, and the
amount of any "specialty items" so performed may
be deducted from the original total contract price
before computing the amount of work required to be
performed by the contractor with his own organiza-
tion.

a. "His own organization" shall be construed to in-
clude only workmen employed and paid directly by
the Prime Contractor and equipment owned or rented
by him, with or without operators.

None of these provisions had any probative value on
the issue and should not have been admitted. The defini-
tion of an employee for the purposes of the contract
definitely included an independent contractor who re-
ceives compensation from the contractor, or even from a
subcontractor, as well as agents and servants. On the
other hand, an independent contractor is necessarily
included in the term subcontractor who, for purposes of
the contract, would be treated as an employee. Even
though the contractor's "own organization" was defined
to include equipment owned or rented by the subcontrac-
tor with or without operators, there is nothing that makes
everyone who comes within the scope of his organization
an employee. These provisions, as we read them, clearly
place independent contractors of the type Hogan alleged
Steele to be as employees for the purpose of construing that
contract, but do not purport to affect their legal status
as between themselves. Cases cited by appellees such as

*Jones and Harrington* v. *Scott,* 116 Ark. 108, 172 S.W. 840, *Brown* v. *Keaton,* 232 Ark. 12, 334 S.W. 2d 676, and *Eldridge* v. *McGeorge,* 99 F. 2d 835 (8th Cir. 1938), relate to other types of contract clauses, such as insurance and safety requirements and have no bearing on the admissibility of the clauses above set out.

We do not agree with appellants, however, that clauses relating to safety requirements of the contract were inadmissible. One of these clauses required Hogan to comply with all pertinent governmental safety requirements and to provide all safeguards and take actions reasonably necessary to protect the life and health of employees on the job. Similar questions were treated in *Hogan* v. *Hill,* 229 Ark. 758, 318 S.W. 2d 580, and *Erhart* v. *Hummonds,* 232 Ark. 133, 334 S.W. 2d 869. We are unable to apply appellants' arguments to distinguish this case from those. True it is that the provisions in each of those cases called for a specific type of precaution while the clause in this case is general. In *Collison* v. *Curtner,* 141 Ark. 122. 216 S.W. 1059, 8 A.L.R. 760, forerunner of *Hogan* v. *Hill,* supra, however, the clause upon which a lessor's liability for injuries on leased premises was founded was his undertaking to "furnish * * * all repairs and new parts of machinery * * *." That clause is little more specific than the one involved here. But the real relevance of the safety provisions lies in their bearing upon the question whether the general contractor was responsible for the safety precautions to be taken for the protection of the employees of persons such as Nichols, an employee of a subcontractor. In *Gordon* v. *Matson,* 246 Ark. 533, 439 S.W. 2d 627, we said that the responsibility of the prime contractor to employees of a subcontractor was to use ordinary care and to warn in the event there are unusually hazardous conditions existing which might affect their welfare, but recognized that there was an exception to this limitation .whenever the prime contractor has undertaken to perform certain duties or activities and negligently fails to perform them or performs them in a negligent manner. Certainly, it cannot be said that the common law duty of Hogan to Nichols necessarily covered all the acts and omissions alleged by Nichols as a basis of liability, such as failure to utilize traffic controls, flagmen and devices governing move-

ment of vehicles on the construction job. Yet, the contract with the Highway Department definitely placed that responsibility on Hogan if such actions were reasonably necessary for the protection of employees on the job. The expression "employees on the job" was certainly broad enough to encompass the employees of Hogan's subcontractors. In *Ratzlaff v. Franz Foods of Arkansas*, 250 Ark. 1003, 468 S.W. 2d 239, we recognized and applied the rule of *Hogan v. Hill*, supra, and *Collison v. Curtner*, supra, that one who owes no duty to third persons or the public may, by contract, assume an obligation to use due care toward such persons or the public. That rule seems clearly applicable here.

We do not agree with appellees, however, that the provisions of the Hogan contract under which the contractor agreed to indemnify and save harmless the State from claims for injuries and damages were relevant or admissible.

We agree with appellants that there was reversible error in restricting the cross-examination of the witness Cumbie, who turned out to be the most important witness in support of Nichols' theory that Cumbie was an employee of Hogan, and who had apparently undergone a change of mind about that relationship between the time his discovery deposition was taken and the time he testified. Specifically, Hogan's attorney should have been permitted to inquire as to the understanding he had with Steele and Hogan, or both, as to the source of his pay and as to whether Cumbie's cashing of a Hogan check rather than turning it over to Steele was not unusual and contrary to the understanding among the parties. We do not think that there was prejudicial error in sustaining an objection to an inquiry to Cumbie whether he had been arrested at the scene of the collision.

Other assertions of error likely to arise on retrial will be treated as briefly as possible. Even though the allegations of Nichols that Joe Pat Cumbie was the agent or servant of Hogan were not as positive as they might have been, we think that the issue was presented. Appellant Hogan, in its answer, denied any agency relationship with Cumbie. At the inception of the trial, Hogan's attor-

ney objected to the introduction of any evidence on this point, but admitted that he had formed the idea that Nichols was making this contention during the few weeks preceding the trial. He did not at any time plead surprise or move for a continuance, in the face of evidence tending to show that Hogan was controlling, directing and paying Cumbie. There was no error in submitting to the jury the question whether Cumbie was an agent or employee of Hogan. There was no reversible error in the giving of AMI 209 over the objection made by appellant Hogan, even though Hogan contended throughout the trial that Steele, the owner of the truck driven by either Steele or Cumbie, was an independent contractor and that Cumbie was the employee of Steele. The only objection to the giving of this instruction was that it only applies when the facts are as consistent with the master-servant relationship as the independent contractor relationship, and that, if given, the jury should be so advised.

We find the evidence sufficient to submit an issue as to Hogan's negligence independent of that of Stewart or Cumbie. There was evidence tending to show that: Hogan had control of the area; the intersection at which Stewart entered a highway slab as the Steele-Cumbie dump truck approached on that slab was provided by Hogan in furtherance of the construction work and was said to have been so located as to impair the view of one approaching from the direction Stewart came; Hogan reserved the right to control the speed of all vehicles on the job and the Steele truck was being driven at an excessive speed; one of Hogan's supervisory employees advised cement truck drivers, such as Stewart, that they had the right-of-way over all other traffic, but gravel truck drivers, such as Cumbie, were not so informed.

The court gave the following instruction as to Hogan's responsibility:

It was the duty of Ben M. Hogan Company, Inc., to use ordinary care to comply with the provisions of its contract with the Arkansas Highway Commission that were inserted for the safety of the public and the employees on the job.

Appellants objected that, under the circumstances, Hogan owed no duties to the public and that plaintiff could not rely on the contract provisions because the contract itself specified that it was not for the benefit of third parties. The objection to the inclusion of the public in the instruction was well taken. Otherwise, the instruction was not vulnerable to Hogan's objections for the reasons given for our holding the contract terms admissible. We do not see how the contract recitation disavowing any intent to create the "public or any member thereof a third party beneficiary" or to authorize anyone not a party to the contract to maintain a suit for personal injuries or property damage pursuant to the terms of the contract alters the fact that under the contract safety controls were the responsibility of Hogan.

Appellant Hogan also complains of the failure of the trial court to give an instruction delineating in detail characteristics of an agency relationship on the one hand and that of an independent contractor on the other. The court gave AMI Civil 707, and we are not convinced that it did not adequately cover the issue presented by the evidence. This being so, our per curiam order of April 19, 1965, with reference to the giving of AMI, governs.

On the other hand, we see no reason why the court should not have given AMI 106, as modified in appellants' request, to apply only to driver defendants. Appellees argued that the instruction was inapplicable because the Committee Comment states that it should not be given when the negligence of one defendant may be imputed to another. Of course, there is no way in which the negligence of Cumbie could be imputed to Stewart, or that of Stewart to Cumbie, so the modification made the instruction appropriate. The Committee Comment is pertinent when the negligence of one of multiple defendants may be imputed to the others. The language of AMI 106 is clearly contradictory to the correct rule of law in that situation. Nothing in Hogan's request would have indicated that the negligence of either or both drivers could not be imputed to Hogan.

We find no error in the admission of testimony tending to show that Steele did not, on the date of the colli-

sion, have a certificate of authority as a contract hauler from the Arkansas Transportation Commission then required under the Motor Carrier Act. The fact that other such operators neglected to obtain such certificates certainly does not distinguish this case from *Phillips Cooperative Gin Company* v. *Toll*, 232 Ark. 236, 335 S.W. 2d 303. Neither do we find a basis for distinction because of evidence that the Steele dump truck had been hired to different people at different times. Even though the question whether Steele was an employee of Hogan was never submitted to the jury, we understand that one of Hogan's contentions was that Steele was an independent contractor and the employer of Cumbie, so Steele's actions in the premises were material and the evidence relevant on that question. Certainly, the evidence was far from conclusive on the question, but this does not mean that the evidence is irrelevant.

The judgment is reversed and the cause remanded.