JOHNSON TIMBER CORPORATION *v.* Norma Jean STURDIVANT, Administratrix, et al.

87-163 752 S.W.2d 241

Supreme Court of Arkansas
Opinion delivered June 6, 1988
[Interim Opinion delivered July 11, 1988.*]
[Opinion of June 6, 1988 Set Aside on Rehearing
October 17, 1988.]

---

* Gipson, Sp.J., joins in the order; Glaze, J., not participating.

624

*Griffin, Rainwater & Draper*, by: *Richard E. Griffin*, for appellant Georgia-Pacific Corporation.

*Laser, Sharp & Mayes, P.A.*, for appellant Johnson Timber Corporation.

*McKenzie, McRae & Vasser*, for appellant Lemmie Smith and J & N Logging Company, Inc.

*Rose Law Firm, A Professional Association*, for amicus curiae American Forestry Association.

*Boswell, Tucker & Brewster*, and *Bramblett & Pratt*, for appellee Norma Jean Sturdivant, Administratrix, etc.; *Compton, Prewett, Thomas & Hickey, P.A.*, for appellees Catherine M. Vestal, Executrix, etc., and James C. and Linda Meshell; *Shackleford, Shackleford & Phillips, P.A.*, for appellee Nelda C. Meshell, Administratrix, etc.

JOHN I. PURTLE, Justice. A Union County Circuit Court jury awarded more than $5,000,000 to the various appellees for three wrongful deaths and a personal injury, all arising out of a motor vehicle collision. The appellants' common arguments for reversal are that the trial court erred in refusing to grant a directed verdict or a judgment notwithstanding the verdict, or a new trial, and that the court erred in refusing to give or in giving certain jury instructions. Numerous other arguments are presented by the several appellants and will be considered later herein. Finding no prejudicial error, we affirm the action of the

trial court in entering judgments in accordance with the jury verdicts.

A truck loaded with pulpwood and driven by Joe Thrower was traveling east on U.S. Highway #82 in Union County shortly before daylight on March 1, 1985, when the vehicle developed an electrical fire and Thrower stopped it in the eastbound traffic lane of the highway. The stalled truck had neither lights nor reflectors to warn other drivers as they approached. Thrower did manage to flag down a westbound log truck, driven by Lemmie Smith, who was employed by J & N Logging Company, Inc. Smith stopped his truck in the westbound traffic lane alongside Thrower's stalled vehicle. Smith told Thrower that he could not help him but would report the situation and send help when he reached the nearby city of Strong.

At the time of the occurrence Thrower was hauling a load of pulpwood for Charles G. Johnson d/b/a Johnson Timber Company to the Georgia-Pacific plant in Crossett. The pulpwood had been cut from land that did not belong to Georgia-Pacific. Thrower owned the truck he was driving. Smith was hauling a load of logs in a truck owned by J & N Logging to a Georgia-Pacific sawmill. These logs had been harvested from Georgia-Pacific land. It is undisputed that Smith was an employee of J & N and was in the course of his employment at the time of the accident.

As Smith drove away from Thrower's truck toward Strong, he met an eastbound automobile driven by Frank Sturdivant, Jr., in which Donald Vestal, Lloyd Meshell and James Meshell were passengers. The automobile crashed into the rear of the Thrower truck resulting in the injury of James Meshell and the death of the other three occupants.

Georgia-Pacific (GP) contracted with Johnson to cut and haul pulpwood from land owned by GP as well as from land owned by others. (The pulpwood being hauled by Thrower was cut from land owned by one Tatum.) Johnson, in turn, had an oral agreement with Thrower to do the actual cutting and hauling. All of the pulpwood being cut and hauled by Thrower during this period was delivered to Georgia-Pacific and was credited to the GP-Johnson contract. J & N contracted to cut and haul timber solely for Georgia-Pacific from Georgia-Pacific land during the

period of time in question. The terms of the contracts and the relationship among these parties will be treated in detail later in this opinion.

Separate suits on behalf of the injured party and the various survivors were filed and were consolidated for trial. The issues of comparative fault, agency and damages were submitted to the jury on interrogatories. The jury answered the interrogatories that the agency relationship existed between Thrower and Johnson, between Johnson and GP, and between J&N and GP, and that Thrower was 85% at fault and Smith 15%. The jury also found Sturdivant was not at fault.

The critical issues in this appeal concern the question of agency between and among the various defendants. The contracts were written by Georgia-Pacific and by their terms obviously intended to create the status of independent contractors, thereby limiting GP's exposure to liability in occurrences such as this. It is therefore necessary to examine in detail the contracts which were in effect at the time.

The cutting and hauling contracts which Johnson & J&N entered into with Georgia-Pacific were essentially the same. The contracts repeatedly stated that Johnson and J&N were independent contractors. The contracts incorporated by reference schedules which were considerably more specific and detailed than the contracts themselves. If a party followed all the specific details and requirements in the contracts there would be no need for any supervision. By complying with the details in the contracts, the "contractors" and their employees were under the direct control of GP as to the details of the performance of the contracts.

Some of the specifics of the contracts were: Georgia-Pacific determined trees to be cut by spotting them with paint; GP dictated the beginning and ending of cutting periods; Georgia-Pacific had the right to speed up, slow down or even stop the harvesting of timber on tracts of land covered by the contract, whether owned by Georgia-Pacific or not; each contract contained provisions requiring the contractors to provide worker's compensation and liability insurance; GP set the minimum limits of coverage and was listed on the policies as a "certificate holder"; the insuring agencies were required to report any changes in coverage or cancellations, etc., direct to Georgia-Pacific;

worker's compensation insurance premiums were withheld by Georgia-Pacific from the proceeds due the contractors for the pulp and logs delivered.

The contracts required Johnson Timber Company and J&N to meet the requirements of the law, including the Fair Labor Standards Act (FLSA) and the Occupational Safety and Health Act (OSHA); provided that accidents be reported to GP's legal department; required that the contractors' records be available for inspection by GP at any time and provided that the records would be inspected at least monthly; gave Georgia-Pacific the right to refuse to unload trucks which were not in compliance with the loading specifications of Georgia-Pacific; required large loads to be separated to allow Georgia-Pacific to unload with their equipment; set detailed specifications for wood which would be delivered including the size, species and general appearance of the wood; and set the destination or delivery point. The specifications set out in the incorporated schedules for "pulpwood contractors," e.g., included:

> Contractor agrees to cut from standing timber only marked trees and to fell said trees free of unmarked trees. (By marked trees are meant only such trees as are marked with paint in a conspicuous manner). All wood must be green and sound, with knots and branches trimmed flush with the body of tree.

> All truck delivered wood must be cut in lengths not less than 4', or greater than 6'-6" in length. Rail wood must be cut in lengths not less than 5', and not more than 5'-6" in lengths.

> No axe-cut or wood with splintered ends will be acceptable.

Georgia-Pacific furnished trained foresters to assist the contractors; prepared the contracts and filled in the blanks before presenting them to the contractors for their signatures; and retained the right to terminate the contracts at any time.

The contracts repeatedly declared that Johnson and J&N were independent contractors and that Georgia-Pacific would not exercise any physical control over the contractors or their employees or equipment and operations. The contracts also

contained "hold harmless" provisions which, when coupled with the requirements and prohibitions, were intended to shield Georgia-Pacific from all angles. Between the contract and the attached specifications there was indeed very little ground not covered.

Due to the multiple briefs and points argued on appeal we consolidate the discussion of the arguments whenever possible.

The central issues which we must decide are whether J&N Logging Company was the agent, servant or employee of Georgia-Pacific; whether Thrower was the agent of Johnson Timber; and, if Thrower was indeed an agent, whether Johnson Timber was the agent of Georgia-Pacific. On appellate review of a trial court's denial of a motion for a directed verdict or a motion for a judgment notwithstanding the verdict, we must determine whether the verdict is supported by any substantial evidence. See, e.g., *Grendell* v. *Kiehl*, 291 Ark. 228, 723 S.W.2d 830 (1987); and *Arkansas Power and Light* v. *Adcock*, 281 Ark. 104, 661 S.W.2d 392 (1983). Substantial evidence is that which is of sufficient force and character that it will compel a conclusion one way or another. *Kinco, Inc.* v. *Schueck Steel, Inc.*, 283 Ark. 72, 671 S.W.2d 178 (1984). Such proof, with all reasonable inferences, is examined in the light most favorable to the party against whom the motion is sought, and if there is any substantial evidence to support the verdict we affirm the trial court.

We have repeatedly held that the two essential elements of agency are authorization and right to control. The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents to so act. *Evans* v. *White*, 284 Ark. 376, 682 S.W.2d 733 (1985). Ordinarily the question of agency is one of fact to be decided by the trier of fact. *Id.* However, if only one reasonable inference can be drawn from the proof presented, then it becomes a question of law. *Evans* v. *White*, supra, citing *Campbell* v. *Bastian*, 236 Ark. 205, 365 S.W.2d 249 (1963).

When it is demonstrated that the person causing an injury was at the time rendering service for another and being paid for that service, "and the facts presented are as consistent with the master-servant relationship as with the independent

contractor relationship, then the burden is on the one asserting the independence of the contractor to show the true relationship of the parties." *Schuster's Inc.* v. *Whitehead*, 291 Ark. 180, 722 S.W.2d 862 (1987), citing *Phillips Cooperative Gin Co.* v. *Toll*, 228 Ark. 891, 311 S.W.2d 171 (1958). "It is generally held by the courts, including our own, that if the employer claims that an employee is an independent contractor for whose acts he is not responsible, the burden is upon him to show that fact." *Phillips*.

 The appellants in the present case entered into written agreements. In *Ozan Lumber Co.* v. *McNeely*, 214 Ark. 657, 217 S.W.2d 341 (1949), we stated:

> Although a written contract creates the relation of employer and independent contractor, such relation may be destroyed by conduct of the employer through direction of means and methods of producing physical results, and it becomes a question of fact for the jury if there is any substantial evidence to show that such conduct became operative.
>
> . . .
>
> Similarly, where the nature of the relation between employer and employee depends upon the meaning of a written instrument collaterally introduced in evidence, and the effect of such instrument depends, not only upon its construction, but also upon extrinsic facts and circumstances, the inferences of fact to be drawn from the instrument must be left to the jury.

The appellants rely rather heavily on *Moore and Chicago Mill & Lumber Co.* v. *Phillips*, 197 Ark. 131, 120 S.W.2d 722 (1938), in which this court held that *Moore* was an independent contractor of Chicago Mill and Lumber. The facts of that case and of the present appeal are superficially similar in that Chicago Mill and Lumber contracted with Moore for the delivery of timber according to specific and definite contractual directions that were to be observed by the contractor in the cutting of the timber, especially as to location and dimension. However, "[t]here [was] nothing in the contract showing an intent upon the part of the company to retain control or direction of Moore in the

exercise of the means or method by which he should perform the contract." Chief Justice Griffin Smith, speaking for the court, observed:

> The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of the performance, then the relation of master and servant necessarily follows. On the other hand, if control of the means be lacking, and the owner does not undertake to direct the manner in which the employee shall work in the discharge of his duties, then the relation of independent contractor exists.

*Moore* defined an independent contractor as one who contracts to do a job according to his own method without being subject to the control of the other party except as to the result of the work. That statement is still the law. Indeed, Arkansas Model Jury Instruction 707, which was given to the jury over the appellants' objection that it is an "inaccurate" or "incomplete" statement of the law, provides in part:

> An independent contractor is one who, in the course of his independent occupation, is responsible for the performance of certain work, uses his own methods to accomplish it, and is subject to the control of the employer only as to the result of his work.

The appellants also rely upon the case of *Newton & Fitzgerald* v. *Clark*, 266 Ark. 237, 582 S.W.2d 955 (1979). True, *Newton* had many facts in common with the present case, but the issue in that case was whether Newton was an independent contractor of Fitzgerald or whether he was merely a supplier of logs to Fitzgerald. The present case is clearly distinguishable from *Newton*. There, the record demonstrated "that Moses Newton does not cut logs from lands marked and designated by Fitzgerald or any of the other contractor dealers. Newton makes his own arrangements with a landowner to cut logs and when he gets a load ready to go, he hauls the logs to Georgia-Pacific's mill."

Both Thrower and Smith were hauling wood to Georgia-Pacific at the time of the occurrence giving rise to this litigation. Smith was hauling logs which had been cut from

Georgia-Pacific land and Thrower was hauling pulpwood which had been contracted for delivery to Georgia-Pacific's Crossett Plant. We held in *Ozan Lumber Co.* v. *McNeely*, supra, that after the plaintiffs introduce testimony showing that the driver of a log truck is hauling for a lumber company at the time of the injuries complained of, the burden then rests with the lumber company to establish the relationship of independent contractor. *Ozan Lumber* also stated that evidence that the company was carrying liability insurance covering the truck driver and evidence that the company paid workers' compensation insurance on the workers are both relevant factors to be considered in determining the issue of employee versus independent contractor.

In *Ozan* we quoted from *Delamar & Allison* v. *Ward*, 174 Ark. 82, 41 S.W.2d 760 (1931), as follows: "Evidence that defendants were carrying liability insurance covering the negligence of a truck driver hauling gravel was a circumstance to be considered in determining whether the truck driver was employed by defendants or was an independent contractor." In the instant case Georgia-Pacific did not carry liability insurance covering the drivers, but by the terms of the contracts Johnson and J&N were required to have such insurance in an amount set by GP and with a company acceptable to GP. GP was listed as a "certificate holder" on these insurance policies and received notice of all endorsements, changes and cancellations.

Workers' compensation insurance covering the drivers is required by the terms of the contracts. In fact, Georgia-Pacific withholds the workers' compensation premiums from the payments made to the contractors for the delivery of wood products by Thrower and Smith. The premiums were based on the quantity of wood delivered rather than the payrolls. By collecting the premiums in this manner it was about as accurate as if the premium had been based upon payroll records. Payment of workers' compensation insurance premiums is evidence relating to the status as employer-employee or independent contractor. *Ozan Lumber.*

Their contracts also required Johnson and J&N to follow the federal laws relating to safety (OSHA) and the FLSA. The guarantee of minimum wages is evidence that an individual is an employee and not an independent contractor. In *Irvan* v.

*Bounds*, 205 Ark. 752, 170 S.W.2d 674 (1943), we stated that compliance with the federal wage and hour law "indicates that Irvan considered Bounds to be an employee, because, if Bounds was an independent contractor, and not an employee, it was not necessary, in order to comply with the federal law, to guarantee him any minimum wage."

There is no hard and fast rule whereby we are always able to determine whether a worker is an employee or an independent contractor. Each case must stand upon its own facts as developed at the trial. All of the parties generally state the correct law applicable to this case. However, as usual, the emphasis and interpretation to be applied to the facts are where the parties disagree.

The following are but a few of the factors considered in reaching our conclusion that the issue was properly a fact question for the jury: GP prepared the contracts and filled in the blanks before presenting them to the "contractors"; required liability insurance with a company acceptable to GP; withheld workers' compensation premiums; could terminate the contract at will; required that the wood be loaded in a manner compatible with GP's unloading equipment; required each worker not only to abide by OSHA standards but also GP's local safety rules; controlled the size and shape of logs and the delivery rate; furnished foresters to assist in locating boundaries, surveying and spotting trees; maintained the right to refuse to accept timber which was not loaded properly, contained culls, or was too small or too large; and maintained the right to refuse to accept timber if the employees were not wearing proper safety equipment.

We cannot point to any specific fact which establishes the employer-employee relationship. However, we conclude that all the facts and circumstances established by the proof, when considered together, are sufficient to present questions of fact to be decided by the jury. See *Phillips Cooperative Gin Co.* v. *Toll*, supra. The employer-employee relationship between J&N and Smith is not in dispute. The facts are clearly sufficient to present the question to the jury concerning the relationships between Johnson and Thrower, between Johnson and GP, and between J&N and GP. We hold that there was substantial evidence to support all findings relating to the issue of agency.

■ Johnson argues that the trial court should have granted it a directed verdict because, as a matter of law, Thrower was an independent contractor. In *Ozan Lumber Co.* v. *Tidwell*, 210 Ark. 942, 198 S.W.2d 182 (1946), we considered the nature of an oral agreement for the cutting and hauling of timber. We stated: "If the contract is oral, and if more than one inference can fairly be drawn from the evidence, the question should go to the jury whether the relation is that of employer and independent contractor or that of master and servant." In the present case, there is sufficient evidence to indicate that both Johnson and GP retained a degree of control over the work of Thrower consistent with his status as an employee. The resolution of this issue was therefor properly submitted to the jury.

The contracts and incorporated schedules were so detailed and complete that there was little room for an independent contractor to function. Practically all decisions relating to the performance of the contracts had already been determined by the terms of the contracts. Georgia-Pacific dominated every phase of the work to such an extent that the relationship between and among the defendants was a question of fact for the jury.

■ All appellants argue the court erroneously gave instructions to the jury or failed to give proper instructions. The rule concerning instructions is stated in our Per Curiam of April 19, 1965:

> If Arkansas Model Jury Instructions (AMI) contains an instruction applicable to a civil case, and the trial judge determines that the jury should be instructed on the subject, the AMI instruction shall be used unless the trial judge finds that it does not accurately state the law. In that event he will state his reasons for refusing the AMI instruction. Whenever AMI does not contain an instruction on a subject upon which the trial judge determines that the jury should be instructed, or when an AMI instruction cannot be modified to submit the issue, the instruction on that subject should be simple, brief, impartial, and free from argument.

■ Appellants argue that the court erred in giving AMI 707 and refusing three instructions on the issue of agency which were requested by the appellants. The notes following AMI 707

provide that this instruction should be given "when there is an issue whether a person is an agent or an independent contractor." The instructions requested by the appellants apparently were taken from *Moore and Chicago Mill & Lumber* v. *Phillips*, supra, and basically are accurate statements of the law. However, as noted earlier in this opinion, AMI 707 is an accurate statement of the law. Indeed, the definition of an independent contractor found in AMI 707 is nearly identical to the definition found in *Moore and Chicago Mill.* Even if a non-AMI instruction correctly states the law, it is not error to refuse it when an AMI instruction covering the same subject matter is appropriate. *Wharton* v. *Bray*, 250 Ark. 127, 464 S.W.2d 554 (1971). The trial court therefor did not err in giving AMI 707 and refusing the three requested instructions.

The defendants requested that the court give an instruction which included the bracketed portion of AMI 901(B):

> When the driver sees danger ahead, or it is reasonably apparent if he is keeping a proper lookout (or if he is warned of approaching imminent danger) then he is required to use ordinary care to have his vehicle under such control as to be able to check its speed or stop it, if necessary, to avoid danger to himself or others.

The trial court instructed the jury according to AMI 901 (A), (B) and (C)—that it is the duty of a driver to keep a proper lookout, to keep his vehicle under control, and to drive at a reasonable speed.

██ The requested portion of 901(B) is properly refused when, e.g., the driver of an automobile is faced with an unexpected emergency which he could not have reasonably anticipated. *Home Insurance Co.* v. *Harwell*, 263 Ark. 884, 568 S.W.2d 17 (1978). On the other hand, in *East Texas Motor Freight* v. *Freeman*, 289 Ark. 539, 713 S.W.2d 456 (1986), we held that it was not error to have given the bracketed part of 901(B), where drivers could see smoke crossing the highway from some distance away. We are of the opinion, in the present case, that the trial court correctly refused the bracketed portion of 901(B). While there was evidence that both Thrower and Smith attempted to warn the approaching automobile of the stalled truck, there was no evidence that the driver of the automobile saw, or reasonably should have seen, the danger.

The defendants also requested that the court instruct the jury according to AMI 910. This instruction simply states that a passenger in an automobile is required to use ordinary care for his own safety. We have held this instruction to be proper only when there is evidence that the passenger's conduct was a negligent act or omission which operated as a proximate cause of the injury. *Reed* v. *McGibboney*, 243 Ark. 789, 422 S.W.2d 115 (1967). There was no such evidence in the present case. Under the circumstances of this case, it would have been pure speculation for the jury to have found that the passengers' failure to warn the driver was a proximate cause of the injuries. See also *Curbo* v. *Harlan*, 253 Ark. 816, 490 S.W.2d 467 (1973); and *Kyser* v. *Porter*, 261 Ark. 351, 548 S.W.2d 128 (1977). Moreover, the court did instruct the jury according to AMI 305(B)—that it was the duty of all persons involved in the occurrence to use ordinary care for their own safety and the safety of others.

Appellant J&N Logging Company also requested that the court give AMI 616, the model instruction based on the "rescue doctrine." J&N argues that Smith was attempting to rescue Thrower, and therefore it was error to refuse the requested instruction. This instruction applies when a person "acting under stress in response to humanitarian impulses" is "attempting to rescue another who reasonably appears to be in danger of substantial injury or loss of life." The court correctly refused this instruction because there was no evidence that Thrower reasonably appeared to be in danger of substantial injury. See *Price* v. *Watkins*, 283 Ark. 502, 678 S.W.2d 762 (1984); and *Woodruff Electric Co-op* v. *Weis Butane*, 225 Ark. 114, 279 S.W.2d 564 (1955).

The appellants objected to the jury being instructed concerning Ark. Code Ann. § 27-51-1303 (1987). This statute concerns stopping, standing, or parking other than in a business or residential district. The statute specifically provides:

(a)(1) Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practicable to stop, park, or leave the vehicle off such part of the

highway. In any event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles, and a clear view of the stopped vehicles shall be available from a distance of two hundred feet (200') in each direction upon the highway.

. . .

(b) This shall not apply to the driver of any vehicle which is disabled while on the paved or main-traveled portion of the highway in a manner and to an extent that it is impossible to avoid stopping and temporarily leaving the disabled vehicle in that position.

The statute does not prohibit any person from leaving a vehicle on the main-traveled portion of a highway when it is impossible to stop, park or leave the vehicle off such portion of the highway. However, the statute requires that "in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles."

In *American Bus Lines, Inc.* v. *Merritt*, 221 Ark. 596, 254 S.W.2d 963 (1953), a passenger bus stopped on the main-traveled part of a highway to discharge passengers. An automobile attempted to go around the stopped bus and collided with an opposite-bound vehicle. The opinion discussed this statute in detail but summed up in the following words:

Every case must be decided on its own facts; and in some cases, as here, it becomes a question for the jury as to whether it is practical to stop the vehicle off the highway . . . But here, where reasonable minds may differ as to whether it is practical to remove the vehicle from the pavement before stopping, it becomes a question for the jury, and the statute may be taken into consideration in determining whether there was negligence in stopping the bus on the pavement.

It is a question of fact for the jury whether it was practical for both Thrower and Smith to have stopped their vehicles on the shoulder of the highway. It is undisputed that Smith stopped his vehicle alongside the Thrower vehicle in violation of this statute. There was evidence that the nearby shoulders of the highway were

sufficiently broad to have allowed the trucks to have stopped off the highway.

Appellant J&N Logging also argues that there is no substantial evidence that Smith was negligent. For reasons stated immediately above, we hold that there is evidence from which the jury could have found that Smith was negligent, which negligence was a proximate cause of the injuries.

Appellants argue that a mistrial should have been granted or that the jury panel should have been quashed due to allegedly improper remarks by counsel for appellees during the voir dire of the jury. The incident complained of was counsel's response to the question of a member of the jury panel concerning a situation where both parties were negligent but the negligence of one outweighed the negligence of the other. The attorney's response was: "I'll give you an example to answer your question. We have in Arkansas comparative negligence law, so if you found the one party 60% at fault and the other one 40% at fault, then a million dollars in damages would be reduced down to $600,000 by the percentage of their negligence."

Although this exact situation has not been previously considered by the court, we have on numerous occasions considered statements by counsel during closing arguments concerning answers to interrogatories. The general rule when submitting a case to the jury on interrogatories, is that the jury may not be informed by counsel or by the court of the effect that their answers may have upon the ultimate liability of the parties. *Wright* v. *Covey*, 233 Ark. 798, 349 S.W.2d 344 (1961). In the case of *International Harvester Co.* v. *Pike*, 249 Ark. 1026, 466 S.W.2d 901 (1971), counsel told the jury in his closing argument: "If the jury finds that Earl Pike assumed the risk of his own injury, he will not receive a nickel." We held that this statement violated the rule against informing the jury of the effect of their answers to interrogatories. See also *Stull, Administratrix* v. *Ragsdale*, 273 Ark. 277, 620 S.W.2d 264 (1981).

In *Buckeye Cellulose* v. *Vandament*, 256 Ark. 434, 508 S.W.2d 49 (1974), plaintiff's counsel in closing argument stated: "[I]f there's some argument about how much, we ask you to decide the larger amount because his Honor, there, if you give [the plaintiff] too much, can cut it down, but if you give him too

little, he can't increase it." Objection was made and the court stated: "I suppose it is improper argument, it is the law but probably is not a proper argument to present to the jury. In any event you are instructed to disregard it." In *Buckeye*, we stated that a trial court is accorded great latitude in correcting any prejudicial effect of argument by counsel and that we do not reverse unless such prejudice appears manifest and the court's admonition is not sufficient to eliminate that prejudice from the jurors' minds. We held that the "admonition" given by the court was insufficient to remove the prejudicial error of the remarks of counsel.

A well reasoned analysis of this subject can be found in *Wright* v. *Covey*, supra. *Wright* held that it is not error, in submitting a case on interrogatories, for the court to instruct the jury that contributory negligence is not a bar to recovery if it is of less degree than the defendant's negligence and that the award of damages is diminished in proportion to the contributory negligence. This statement of the law is remarkably similar to the comments objected to in this appeal. We stated in *Wright* that we did not think this instruction "had the effect of telling the jurors anything which they as intelligent men might not have deduced from the wording of the special interrogatories." We went on to remark: "It is a matter of common knowledge to the bench and bar that counsel may argue long and loud to the jury that a certain issue should be answered in a particular way."

Counsel's comments during voir dire explaining comparative negligence law are similar to these statements made in closing argument or in the court's instructions. The general rule appears to be that while an attorney may specifically argue what the answer to an interrogatory should be, he may not comment on the effect the answers will have on the outcome of the trial. In this case we believe the trial court cured the error, if there was any, by admonishing the jury to disregard the explanation of the law given by plaintiff's counsel. The failure of the trial court to grant a mistrial will not be reversed unless the court clearly abused its discretion.

Appellants also claim prejudicial error when counsel for one of the plaintiffs during opening argument displayed the interrogatories before the jury and argued for appropriate an-

swers. A motion for mistrial was denied. Such conduct amounts to no more than suggesting the answers to interrogatories.

The appellants strenuously argue that the various insurance policies should not have been admitted into evidence. They argue that the policies were not relevant to the issue of agency, or, if relevant, the probative value of this evidence is substantially outweighed by its prejudicial effect. The various insurance contracts were entered into the record with the limits of coverage deleted. Appellant Johnson specifically argues that his liability insurance policies had no relevance because they did not include coverage for Thrower or Thrower's vehicle. Appellant J&N concedes its policies covered Smith but argues they were not relevant.

There was much discussion among the attorneys and between the attorneys and the trial court concerning the introduction of the various insurance policies and the cautionary instruction to be given to the jury. Before the trial commenced there was a lengthy discussion in chambers concerning the admission of the policies, including an exchange among the attorneys for the defendants concerning the frequency that the admonition should be given. After considerable discussion about the admonition to be given limiting the purpose for which the policies had been introduced, the court stated: "I'd ask you to write out, I'd ask both of you to write out that admonition that you feel that the court should make to the jury and let me consider both, then I'll make that and I'll read it to the jury . . . You write it out, let me see it and I will admonish the jury in that regard." The instruction agreed upon by counsel at that time is as follows: "The question of insurance is only to be considered by you, the jury, in determining the relationships between the parties and should not in any way be considered by you for any other purpose." The court, after reading this instruction to counsel, then stated: "I'll give that when you desire it."

After the trial was in progress there was another discussion in chambers concerning the introduction of the insurance policies. This discussion focused on the deletion of the coverage limits from the policies and the instruction to be given concerning the deletions. The trial then continued in open court, and the policies, with the coverage limits "whited out," were introduced into

evidence. Before their introduction the court gave a limiting instruction which included the following statement:

> So those are additional items or exhibits which are in evidence which you are entitled to see and to examine. I do have an admonition with respect to both exhibits. Exhibits introduced into evidence relating to certificates of insurance have been altered by Order of the Court in order to eliminate or eradicate the limits or the amounts of the insurance, and such should not be considered by you. Such eliminated or eradicated portions of the contract, that's not made to deceive or in any [way] mislead you. Merely by Order of the Court as this particular item of insurance relates to the evidence. Is that an acceptable admonition by all parties?

One of the defense attorneys replied: "Yes, your Honor."

From the record it is obvious that the litigants had an agreement as to the exact wording of the limiting instruction, but that the court slightly misstated it when he cautioned the jury. However, defense counsel then agreed that the instruction given by the court was satisfactory.

 It is fundamental that evidence relating to the existence of liability insurance is not ordinarily admissible because of its lack of relevance and its inherently prejudicial nature. *Ben M. Hogan, Inc.* v. *Nichols*, 254 Ark. 771, 496 S.W.2d 404 (1973). Such evidence should be admitted only when it is relevant to the issues. In *Hogan*, we stated:

> Evidence along these lines has been admitted when it tended to show facts or circumstances having a bearing upon an issue. This policy or its content could be admitted only to the extent it tends to show that Cumbie and Steele were employees of Hogan.

In *Brown* v. *Keaton*, 232 Ark. 12, 334 S.W.2d 676 (1960), we stated that contractual provisions for liability insurance, though not admissible for all purposes, were relevant matters to be considered by the jury on the issue of a party's status as an employee or independent contractor. See also *Ozan Lumber* v. *McNeely*, supra; and *Phillips Cooperative Gin Co.* v. *Toll*, supra. *Brown* emphasized, however, that the jury should be instructed to

consider such evidence only with respect to the issue upon which it is admitted. *Brown* further emphasized that it is incumbent upon the plaintiffs, when offering proof not admissible for all purposes, to request that the court admit it for the limited purpose only.

An early case involving this question is *Delamar and Allison* v. *Ward*, supra. There evidence of liability insurance was submitted to the jury with the instruction that "This testimony is submitted to you as a circumstance only for you to consider in determining whether or not Delamar and Allison, the defendants, had any control or dominion over the truck which figured in the case you are now trying, and you will not consider that testimony, gentlemen, for any other purpose . . ." This court held that the fact that the defendants were insured against liability for injuries occasioned by the truck drivers was a circumstance to be considered in determining whether the drivers were employees or independent contractors.

 Johnson argues rather strenuously that his insurance policies were not relevant and that their admission was highly prejudicial. The record reveals that the policies named Georgia-Pacific as a "certificate holder" on both the general liability and vehicular liability policies. The general liability policy covered, among other things, "hired and non-owned" vehicles. Other liability policies covered several log trucks, tractors and trailers. Johnson testified that he did not own any such equipment. It is clear that these policies were relevant to the determination of the relationship among the defendants, GP, Johnson and Thrower.

 The trial court did not err in allowing the policies to be introduced into evidence. As stated in *Brown* v. *Keaton, Hogan* v. *Nichols*, and *Delamar and Allison* v. *Ward*, liability insurance is relevant to the determination of the issue of employee or independent contractor. Such evidence is, of course, subject to a limiting instruction. Although the exact instruction agreed upon before the trial commenced was not given, the defendants not only did not object to the instruction given by the court, they expressly agreed that the instruction was satisfactory.

 We lastly consider the argument that the award to Linda Meshell in the amount of $750,000 for loss of consortium is so grossly excessive as to shock the conscience of the court. We have many times considered the argument that an award of

damages for loss of consortium was excessive. We review each case upon its own merits and reduce the award only if it is shown to have been influenced by prejudice or is so grossly excessive as to shock the conscience of the court. *Morrison* v. *Lowe*, 274 Ark. 358, 625 S.W.2d 452 (1981). Consortium is not easily defined. From our prior cases we conclude that consortium may be generally defined as the comfort, society, affection, services, and other indefinable elements reasonably expected from the injured person. Damages for loss of consortium do not include the personal inconvenience of the claimant. Nor do they include matters such as pain and suffering, loss of wages, medical expenses and other damages personal to the injured party. In the present case, Mr. Meshell has received a judgment covering these elements of damages. Ms. Meshell's claim for loss of consortium must stand or fall on its independent merit.

The excessiveness of a verdict must be considered on a case by case basis and each must be examined on its own facts. *Breitenberg* v. *Parker*, 237 Ark. 261, 372 S.W.2d 828 (1963). Although loss of consortium is most difficult to measure in dollars and cents, recovery for such loss should be dictated by reason and justice. *White* v. *Mitchell*, 263 Ark. 787, 568 S.W.2d 216 (1978). We considered the propriety of an award for loss of consortium in *Morrison* v. *Lowe*, supra, where the trial court had reduced the jury verdict from $100,000 to $30,000. In affirming the reduction of the award we pointed out that we review the record de novo on appeal to determine whether the amount of the judgment shocks the conscience of this court. We have often reduced consortium awards because the jury considered matters included in the spouse's recovery. See, e.g., *Scheptmann* v. *Thorn*, 272 Ark. 70, 612 S.W.2d 291 (1981).

Factually no two cases are exactly alike. Therefore, in reaching our decision on this award for loss of consortium, we are compelled to review the facts. The husband's injuries in this case were severe. He is generally confined to a wheelchair, wears diapers, is fed through a funnel in an opening in his stomach, is incapable of a conjugal relationship, and will probably never regain bowel and bladder control. He has severe speech impairment and considerable brain damage. All the testimony relating to the husband's injuries was before the jury at the same time that it was considering the wife's claim for damages. Ms. Meshell's

damages and the damages of her husband are interwoven and difficult to distinguish. The wife told how she sat by her husband's bed at night and cried until she couldn't cry anymore. Much of her testimony concerned the care and services she rendered to her husband.

After reviewing the evidence presented to the jury, we are confident that the award for loss of consortium was based partly upon matters included in the husband's recovery and not properly embraced within the concept of consortium. We conclude that the amount of the award was influenced by passion and is therefore excessive. Much of the wife's testimony related to her husband's pain and suffering and his horrible injuries and permanent disabilities as well as the services she rendered in caring for him. These items constitute elements of the husband's recovery. The judgment for Linda Meshell in the amount of $750,000 is excessive and should be reduced to $250,000.

The issue as to employee or independent contractor was in sharp dispute. Unquestionably there was substantial evidence to support the verdict of the jury on the issue of agency. Had the decision been for the appellants there would have been substantial evidence to support that verdict. The facts presented clearly establish that the issue was one properly presented to the jury for resolution. We conclude therefore that the trial court did not commit prejudicial error in refusing to direct a verdict, or grant a judgment notwithstanding the verdict or a new trial. As discussed above we do not find any of the other arguments sufficient to reverse the decision of the trial court except with respect to the award of damages to Linda Meshell. If within seventeen days she will enter a remittitur of $500,000, the judgment will be affirmed. Otherwise, the case will be remanded for a new trial on the question of damages for her loss of consortium. As to all other parties the judgment is affirmed.

Affirmed upon condition.

HICKMAN, J., concurs.

GLAZE, J., not participating.

MIKE GIBSON, Special Justice, dissents.

DARRELL HICKMAN, Justice, concurring. I wholeheartedly

agree with the majority decision. I write separately only to point out that I was one of two members of the court who dissented in *Newton & Fitzgerald* v. *Clark*, 266 Ark. 237, 582 S.W.2d 955 (1979). I find the facts of that case, which involved the appellant Georgia-Pacific, and the legal arguments made there, very similar to those in this case. There are even more compelling arguments present in this case to justify the action taken by the trial court.

MIKE GIBSON, Special Justice, dissenting. Independent contractors are the backbone of many industries in Arkansas which are dependent upon such contractors to deliver needed food sources or raw materials to be processed or manufactured into a marketable product. The issue of independent contractor relationships has been much litigated through the years, since it is often a first line defense in tort litigation to avoid imputed liability to the owner. There is one crucial element that has always been applied in Arkansas when deciding the issue, and that is whether or not the owner has actual control or the right to control the method and manner of the work contemplated, and not just the end result.

The appellate court's responsibility in reviewing a trial court's denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict of the jury has been well stated by the majority, which is that if only one reasonable inference can be drawn from the proof presented, then it becomes a question of law. *Evans* v. *White*, 284 Ark. 376, 682 S.W.2d 733 (1985). In the case now before the court, there is but one "reasonable inference" to be drawn from the proof presented: Georgia-Pacific (GP) had no control or even any right to control the physical conduct or method and manner in which the work was conducted by the appellants, Johnson Timber Corporation (Johnson) and J & N Logging Company (J & N), when cutting, loading, and hauling logs to GP's mills, and no principal-agent or employer-employee relationship existed. The trial court, as a matter of law, should have directed a verdict or granted the motion for judgment notwithstanding the verdict for the appellant, GP.

The owner-independent contractor vs. principal-agent relationship is founded upon the issue of whether or not GP had any

physical control or the right to control the physical conduct or method and manner of Johnson and J & N when actually cutting, loading, and hauling the logs to GP's mills, which was the substance of their agreements, and which the parties had contracted to perform. At the time of the tragic accident, Johnson and J & N were both in the process of cutting, loading, and hauling logs to GP's mills.

The law in Arkansas was very aptly stated by Chief Justice Griffin Smith in *Moore and Chicago Mill and Lumber Co.* v. *Phillips*, 197 Ark. 131, 120 S.W.2d 722 (1938), a case directly on point, which has been followed as the law in Arkansas for almost fifty years:

> By a long line of decisions this court is committed to the universal rule, that where the contractor is to produce a certain result, according to specific and definite contractual directions, agreed upon and made a part of the contract, and the duty of the contractor is to produce the net result by means and methods of his own choice, and the owner is not concerned with the physical conduct of either the contractor or his employees, then the contract does not create the relation of master and servant. This court has consistently accepted and stated the settled rule that even though control and direction be retained by the owner, the relation of master and servant is not thereby created unless such control and direction relate to the physical conduct of the contractor in the performance of the work with respect to the details thereof.

There are no facts in the record to indicate that the appellant, GP, had any control over the physical conduct of any of the other appellants, nor, more importantly, even a right to control such conduct, which involves the cutting, loading, and hauling of logs, at the time of the tragic accident which resulted in the death of four individuals near Strong, Arkansas. GP must have had control or the right to control the method and manner of the work to be performed (cutting, loading, and hauling logs) by the appellants, Johnson and J & N, as opposed to the right to control the end result, in order to establish a principal-agent or master-servant relationship.

Appellants and appellees relied heavily upon the written

agreements of the parties as evidence of the owner-independent contractor relationship and the principal-agency relationship. Since there was no evidence before the court which questioned the legality of the agreements or the good faith of the parties in entering into the agreements, the issues are: (1) whether or not the agreements, in and of themselves, create the relationship of principal-agent or owner-independent contractor between GP and Johnson, and GP and J & N; and (2) if such agreements do create an owner-independent contractor relationship, has the subsequent conduct of the parties created a principal-agency relationship?

The agreement between J & N and GP, titled "Cutting and Hauling Contract," first states that GP and J & N have reached an agreement and then describes the lands on which GP owns timber that has been marked by GP for cutting and the log specifications, "large butt logs, 33" or 35", with minimum scaling diameter of 14"; and to be delivered to El Dorado." The preliminaries of the agreement provide that GP desires to have the logs cut and hauled, and that J & N desires to cut and haul the logs in accordance with the terms of the contract.

Paragraph 1 provides that:

> *The duration of this contract shall be for four (4) weeks from date hereof.* The contractor agrees to cut, and shall have the exclusive right to cut, the now marked and identified timber on the property heretofore specified and to haul same to the destinations named in Paragraph 4 . . . . Cutting and hauling shall, in all respects, comply with sound principles of timber conservation and shall be done in accordance with the specifications . . . *Georgia Pacific shall exercise no control over any employee of the contractor or any equipment owned or used by the contractor.* Georgia Pacific may, at any time, examine the *results of the operations* of the contractor to see that the provisions of this contract, including the specifications as set forth in Schedule A, have been complied with . . . . [Emphasis added.]

Paragraph 2 provides that "the contractor agrees, *at times of his choosing*, to cut and haul diligently, weather permitting . . . . The contractor understands that Georgia Pacific's ply-

wood plants must have a steady flow of raw materials . . . ." [Emphasis added.]

Paragraph 3 states that Georgia-Pacific shall weigh and scale the logs for payment when delivered, but also that "if the contractor disagrees with the scale, he shall have the right to have the logs rescaled in his presence."

Paragraph 4 sets forth that the contractor is to be paid weekly, and states the rate to be paid per thousand-foot log scale and the point of delivery.

Paragraph 5 provides that the contractor shall reimburse GP for avoidable damage caused by the contractor to GP property, and also provides that "*either party . . . may . . . by giving the party in default three (3) days written notice, cancel and terminate this agreement.* [Emphasis added.] Upon such cancellation and termination, the offending party hereunder shall remain liable to the other party for actual damages sustained by such other party."

Paragraph 6 states that the contractor:

> will comply with all the state and federal laws and regulations imposed upon any person employing labor or renting equipment, including, but not limited to, the Fair Labor Standards Act of 1938, as amended (hereinafter referred to as the Wage-Hour Law), and the Occupational Safety and Health Act of 1970, as amended.

The agreement further provides that the contractor must keep payroll records and "make all payroll records available to GP at any reasonable time in order that they may be checked . . . ." Also, the contractor is required to insure that his employees comply with OSHA safety regulations and specifically, wear safety goggles in the area where trucks are being unloaded.

Paragraph 7 provides that the contractor is to hold harmless and indemnify GP for any loss to persons or property arising out of the work to be performed as a part of requiring the contractor to maintain Workers' Compensation insurance and public liability insurance with the company acceptable to GP.

Paragraph 8 states that the contract represents the *entire agreement* between the parties. [Emphasis added.]

Paragraph 9 provides that if GP cannot take delivery by reason of an act of God, strikes, etc., then GP would not be liable to the contractor.

The agreement was signed by GP and J & N.

The Confirmation of Purchase Agreement entered into between GP and Johnson is not nearly as detailed as the J & N Contract, and is more in the nature of a supply contract. GP entered into an agreement with Johnson to purchase timber from Johnson to be cut on private lands not owned by GP.

The Confirmation of Purchase Agreement states that the buyer (GP) has agreed to purchase from the seller (Johnson), and paragraphs 1 and 2 state the price to be paid and that delivery is to be made by truck.

Paragraph 3 provides that the buyer (GP) shall scale all wood, however transported, in accordance with specifications set out in Schedule A.

Paragraph 4 provides that "because of *the risk of buyer under certain provisions of the Wage-Hour Law*, seller agrees to comply fully with all provisions . . . ," (emphasis added) specifically, (a) to pay minimum wages, (b) to keep payroll records and require seller's subcontractors to maintain such records, (c) to make payroll records available for buyer's (GP) inspection, and (d) to comply with OSHA safety regulations and safety rules of GP while on the property.

Paragraph 5 provides and gives each party, buyer and seller, the right to cancel the agreement or reduce the amount of production at any time by giving notice to the other.

Paragraph 6 provides that the seller (Johnson) warrants good title to the timber being purchased. Although not specifically stated in the Confirmation of Purchase Agreement, GP did require Johnson to maintain public liability insurance in specific amounts.

There is nothing in the record to indicate that the parties did not execute the contracts in good faith, and there is no question that the agreements were in effect at the time of the accident.

The contract between J & N and GP clearly states that "GP

shall exercise no control over any employee of the contractor or any equipment owned or used by the contractor." There is no evidence to the contrary in the record.

The Confirmation of Purchase Agreement between Johnson and GP does not establish any right of GP to control the method and manner of the work to be performed by Johnson. There is no evidence to the contrary in the record.

The Cutting and Hauling Contract between GP and J & N and the Confirmation of Purchase Agreement between GP and Johnson is not unlike the contract examined by the court in *Moore, supra*, where we stated that "the contract between Moore and the Company was filed as an exhibit to the answer. There was no substantial proof to show that the contract was colorable, nor were there any allegations or proof to show that it was not bona fide."

It is obvious from an examination of the written agreements entered into by the parties that there is nothing in the agreements to show an intent on the part of GP to retain control or direction of appellants, Johnson and J & N, in the exercise of the physical means or method by which Johnson and J & N performed under the contracts. There is no direction or control relating to the physical conduct of Johnson or J & N or their employees in the execution of the contracts. The contracts do provide certain directions to be observed by Johnson and J & N in the cutting of the timber, especially as to size, place, and dimension, but these are specific and definite and similar to plans and specifications often found in contracts covering the performance of labor of a similar character. The design of these agreements is to provide a given result, not the method and manner of the work to be performed. *Moore, supra.*

As stated in *Moore*, this court has consistently accepted and stated the settled rule that even though control and direction be retained by the owner, the relation of master and servant is not thereby created unless such control and direction relate to the *physical conduct* of the contractor in the performance of the work with respect to the details thereof.

In *Skorcz and J. H. Hamlen & Son, Inc.* v. *Howie*, 243 Ark. 640, 421 S.W.2d 874 (1967), a case in which Hamlen inspected

the area where the logs were to be cut on a weekly basis in order to determine if the logs were cut within the boundary lines; whether the trees were the proper size; if the stumps were too high; and if useable logs were left, we reversed a judgment against Hamlen and held that the evidence did not support a jury finding that an independent contractor relationship did not exist, and, in addition, was not supported by the fact that Hamlen had fired the contractor for not complying with those requirements. The same is true in the case before this court.

Several "specifics" are cited as evidence that Johnson and J & N and their employees were under the "direct control" of GP to sustain a master-servant relationship between GP and Johnson and GP and J & N. The term "specifications" is probably the more appropriate term to describe the "specifics" to be observed by Johnson and J & N in the cutting and hauling of the timber. However, all of the items referred to, if poured into one bag, provide no substantial evidence of any actual physical control by GP in the method and manner of the physical work to be performed, that is, the cutting, loading, and hauling of logs to GP's mills, or even the right of GP to control such work. There is a total lack of control of the means by which each "contractor" was to complete the work for GP, and there is no substantial evidence whatsoever that GP undertook to direct the manner in which the contractors or their employees should work while performing their duties as agreed to under the written agreements.

Since, under the terms of the written agreements, Johnson and J & N are independent contractors in their relationship with GP, the court must next determine if there is any evidence to show that by subsequent conduct, GP and Johnson and J & N abandoned their contractual relationship and entered into a principal-agent or master-servant relationship. In reviewing the record, the evidence offered outside of the written agreements, even testimony offered by appellees, corroborates and reaffirms the intent of the parties when entering into the Cutting and Hauling Contract and the Confirmation of Purchase Agreement.

Gene Staggs, a Procurement Forester for GP, testified by deposition that GP has no control over the kind of vehicle the contractor has, the shape they are in, who drives them, or how the wood is procured by the suppliers in the case of Johnson. In fact,

GP, in its dealings with Johnson, dealt only with Johnson on a buyer-seller basis and did not even know that Thrower, who was driving the truck stopped on the highway near Strong which resulted in the accident, was one of Johnson's drivers.

Joe Frank Thrower, who cut and hauled the logs to GP from lands procured by Johnson, testified that GP did not have anyone out on the job directing him to do anything, and that he dealt with his own operations and employees without assistance and direction from GP.

Mr. Charles Gil Johnson, the owner of Johnson, stated that GP did not check the equipment used by the log haulers, and has never, at any time, given him any advice about equipment to be used, or how to go about the "*manner and means*" of cutting and hauling the pulp wood.

Jerry Adams, the owner of J & N, testified that GP did not tell him who to work or who not to work out on the job and had nothing to do with his equipment. He further stated that the withholding and payment of Workers' Compensation payments by GP on behalf of J & N was something they just help with that saved him bookkeeping and made audits easier for GP.

Mr. Carroll Barnett, who had been in the wood business since 1946, was called as a witness at the trial by the appellees and testified that GP had never given him any instructions on how to run his operations; when he worked; what trucks he was to use; who he was to employ; or the method of cutting the timber and the manner in which he hauled it to the mill—which is all left up to him. He further testified that GP had no control over his equipment, his employees, or him.

In reviewing both the written agreements presented at the trial and the testimony, it is obvious there was no substantial evidence before the trial court at the close of appellants' case to indicate that GP had controlled the "method and manner" of Johnson, Joe Frank Thrower, J & N or Lemmie Smith when cutting and hauling pulp wood and logs to GP's mills.

On review of the trial court's order denying the motion for a directed verdict or motion notwithstanding the verdict requested by GP, we must determine whether the verdict is supported by any *substantial evidence* in a light most favorable to the party

against whom the motion is sought. *Grendell* v. *Kiehl*, 291 Ark. 228, 723 S.W.2d 830 (1987). Substantial evidence is that which is of sufficient force and character that it will compel a conclusion one way or another. *Kinco, Inc.* v. *Schueck Steel, Inc.*, 283 Ark. 72, 671 S.W.2d 178 (1984). In this case, there was no "substantial evidence" to submit the independent contractor issue to the jury, and it was error for the trial judge not to grant the motion for a directed verdict or motion for judgment notwithstanding the verdict of the jury in favor of GP.

Apparently, several factors were relied upon by the trial court in reaching the conclusion that the issue was a proper question for the jury, which are hereafter addressed separately:

(1) GP provided the contracts and filled in the blanks before presenting them to the contractors.

The fact that GP prepared the contracts represents no evidence of the right of GP to control the physical conduct or the method and manner of the work to be performed, which was cutting, loading, and hauling logs to GP's mills. Since there is no evidence tending to question the execution of the contract, although there is an abundance of testimony reflecting that the parties understood the terms of the agreement in regard to their relationship, we must assume that the contract was executed in good faith by both parties. In fact, the record reflects that at the close of the appellees' case, GP moved for a directed verdict, alleging, among other things, that there was no evidence to support any scheme, plan or method by GP to insulate itself from liability. The trial court, in ruling upon the motion, found that the plaintiffs had not made a case to prove any scheme, plan or method by GP to insulate itself from liability. The trial court ruled that the allegation as set forth in the amended complaint of the plaintiffs had failed. There was no cross-appeal filed by the appellees in this case alleging error in the granting of the directed verdict by the trial judge, and we must, therefore, recognize on appeal that there was no scheme, plan or method by GP to insulate itself from liability.

(2) GP required liability insurance with a company acceptable to GP.

The liability insurance required did not insure GP, but only

insured Johnson and J & N for liability for the negligence of their employees. J & N cut and hauled logs from property owned by GP, and both J & N and Johnson's employees delivered logs on GP property, exposing GP's land and property to damage by J & N and Johnson, for which liability insurance coverage would provide some protection. Public policy should encourage, not discourage, a general public liability insurance to provide a means of compensation to those who might be injured.

GP did not pay for the liability insurance purchased by its contractors, but the insurance was paid for by the contractors from their own funds.

*Ozan Lumber Co.* v. *McNeely*, 214 Ark. 657, 217 S.W.2d 341 (1949), cites *Delamar & Allison* v. *Ward*, 184 Ark. 82, 41 S.W.2d 760 (1931), where it was held that "[e]vidence that *defendants were carrying liability insurance covering the negligence of a truck driver* hauling gravel was a circumstance to be considered in determining whether the truck driver was employed by defendants or was an independent contractor." [Emphasis added.] *Ozan* was relied upon to support the proposition that since GP required Johnson and J & N to maintain public liability insurance, the relationship became one of principal-agent. However, in the case before this court, as the testimony reflects, the liability insurance premiums were not paid by GP, nor was GP the named insured. Johnson and J & N, not GP, paid for their own general liability insurance to insure themselves against the negligence of their own employees.

Certainly, it should be the public policy of this state that public liability insurance be encouraged. The fact that public liability insurance is required of an independent contractor, who pays for the insurance, is not evidence of any control as opposed to the situation in which the owner would insure himself for liability of the alleged independent contractor. This case and *Delamar, supra*, are distinguishable.

(3) GP withheld Workers' Compensation premiums and required Workers' Compensation insurance be maintained by the contractors' employees.

Again, GP paid no Workers' Compensation premiums with any of its funds, nor did it insure any of Johnson's or J & N's

employees, but instead, they insured their own employees, and the premiums were paid by them. GP should not be penalized for complying with Arkansas law. In *Brothers* v. *Dierks Lumber & Coal Co.*, 217 Ark. 632, 232 S.W.2d 646 (1950), this court held in an opinion written by Justice Leflar that Arkansas Statutes Annotated § 81-1306 (1947) does make a "prime contractor" liable for the death and injury of an employee of a subcontractor when the subcontractor fails to secure compensation required by the Act. The Defendant in *Brothers* was a forest products company, and the court found the products company liable for payment of Workmen's Compensation benefits to an employee of the contractor. Compliance with the law in Arkansas should not be used to destroy the independent contractor relationship which existed, and such compliance should be encouraged.

In *Ozan, supra,* the court held that "if" it had been shown that appellants paid Workmen's Compensation insurance on Kirby for his employees, such testimony would have been relevant as a circumstance to be considered by the jury in determining whether Kirby was an employee or independent contractor. Since there was no such evidence, and since Kirby operated under the same written agreement that the company had with all of its logging contractors, it was reversible error to submit the issue of the employee relationship to the jury, and this court stated, "[w]hen the testimony in the instant case is considered in the light most favorable to appellees, we find no substantial evidence showing a modification of the written contract by the practice under it sufficient to support the verdict on this question."

*Ozan* cannot be stretched to stand for the proposition that since GP withheld money from and paid Workmen's Compensation premiums for Johnson and J & N's own funds, as a matter of convenience, as testified to by Jerry Adams, these acts made Johnson and J & N employees or agents of GP. To meet the test laid down in *Ozan*, the appellants would have to have shown that GP paid Workers' Compensation premiums on the employees of Johnson and J & N from its own funds.

(4) GP could terminate the contracts at will.

In *Moore, supra,* it was also contended by counsel for appellees that the power reserved to the company to permanently discontinue operations under the contract in and of itself created

the relation of master and servant. The court further noted that the "power to discharge," which is unrestricted, is a very important circumstance tending to disprove the relation of independent contractor. However, in this case, as stated by the court in *Moore*, the parties to this contract agreed that it might be temporarily suspended or totally rescinded. GP, Johnson, and J & N were competent to make such an agreement and, as such, it is distinguishable from an "unrestricted right of discharge," a condition which usually arises where the work to be done is general and indefinite, rather than definite and specific, as found in this case.

In the case now before the court, the parties entered into a written agreement in good faith; had full knowledge and understanding at the time of contracting that the agreement might be suspended or terminated, dependent upon supply needed; were competent to make such decisions; and the work to be done was definite and specific, just as in *Moore, supra*. The fact that GP could terminate the contracts at will does not destroy the independent contract relationship.

(5) GP required that the wood be loaded in a manner compatible with GP's unloading equipment and could refuse timber not properly loaded, or which was too small or too large; controlled the size and the shape of the logs and the delivery rate; furnished foresters to assist in locating boundaries, surveying and spotting of trees to be cut; and maintained the right to refuse to accept timber if employees were not wearing proper safety equipment while on GP's premises.

These facts relied upon by the majority to find an agency relationship have nothing whatsoever to do with control over the method and manner of the cutting, loading, and hauling of the logs.

The *Moore* case clearly held that supervision of the work in progress, specifications on the cutting of the timber, and the marking of logs that should be cut and hauled to the mill does not destroy the independent contractor relationship. In *Moore*, we stated:

> This court has consistently accepted and stated the settled rule that even though control and direction be retained by

the owner, the relation of master and servant is not thereby created unless such control and direction relate to the physical conduct of the contractor in the performance of the work with respect to the details thereof.

(6) GP required each worker to abide by OSHA standards and GP's local safety rules, and to comply with the Fair Labor Standards Act.

Clearly, under the law, GP's liability under OSHA extended not just to its own employees, but also to employees of subcontractors and independent contractors. In *Teal* v. *E. I. Dupont De Nemours & Co.*, 728 F.2d 799, 804 (6th Cir. 1984), the court found that Congress had enacted 29 U.S.C., § 654(a)(2), "for the special benefit of all employees of an independent contractor who performed work at another employer's workplace."

For GP to purchase logs produced by employees who are not paid the minimum wage or overtime would be in violation of the "Hot Cargo" provision of the Fair Labor Standards Act, 29 U.S.C., § 215 (a)(1), for which GP would be liable for penalties. As held in *Wirtz* v. *Loan Star Steel Company*, 405 F.2d 668 (5th Cir. 1968), GP must also make a good faith effort to comply with the Act. No doubt, in an effort to comply with the law, GP required Johnson and J & N to comply with the Fair Labor Standards Act, and retained the right to audit their records to insure compliance as required by law.

The case now before the court is one where the proverbial "one cannot see the forest for the trees" is applicable. The substantive agreement between GP and Johnson and J & N deals with the cutting, loading, and hauling of logs to GP in order to keep GP supplied with a sufficient supply of logs to meet its production demands. J & N cut, loaded, and hauled logs under the terms of a "Cutting and Hauling Contract" upon lands owned by GP. Johnson procured timber on its own and hired Thrower to cut, load, and haul logs to GP under the terms of the Purchase and Confirmation Agreement between Johnson and GP. In both cases, GP executed no control over the physical conduct of J & N and its employees, or Johnson and its agents or employees, when cutting, loading, and hauling logs to GP's mills.

The "trees hiding the forest" are such things as preparation

of the contracts by GP; the requirement of liability insurance by GP; the withholding of Workers' Compensation premiums from funds due the contractors by GP and paying it for their convenience; the fact that GP could terminate the contracts; requiring that the wood be loaded in a manner so that it could be unloaded by GP's equipment when delivered; requiring the workers to comply with OSHA standards and local safety rules; setting the specifications of the size and shapes of the logs and their delivery rate; and designating trees to be cut which would comply with GP's specifications. None of these "trees which hide the forest" have anything to do with the control of the physical conduct, by GP, over the method and manner in which Johnson and J & N cut, loaded, or hauled the logs to the mill.

The record does not contain substantial evidence, either in the written documents or testimony, that GP controlled or even had a right to control the method and manner of the cutting, loading, and hauling of the logs to GP's mills. The only involvement of GP in this process was to be sure that the logs met certain specifications, and GP sought to protect itself by requiring its contractors to comply with the law.

In *J. L. Williams & Sons, Inc.* v. *Hunter*, 199 Ark. 391, 133 S.W.2d 892 (1939), this court held that there must be definite and substantial evidence in order to "go behind" the independent contractor relationship, when such relationship appears to exist as a result of written contracts:

> It is common knowledge that hundreds of logging operations throughout the state are constantly handled under contract, both oral and written, which leave to the performing party complete independence in effectuating the purpose of such contract. While the facts of each case should be carefully examined when suits are filed for personal injuries resulting from operations conducted by so-called independent contractors, something more than speculation and conjecture is necessary to convert a bona fide contract independently performed into one of master and servant.

199 Ark. at 395, 133 S.W.2d at 894.

In *Skorcz and J. H. Hamlen & Son, Inc., supra*, the court

found that an independent contractor relationship existed, and reversed a jury finding to the contrary. The facts in *Skorcz* are not unlike the facts in the case now before the court, where the injured party contended that the log hauler was not an independent contractor because:

> about once a week a representative of Hamlen visited the tract to see if the operation was confined within proper boundary lines; if all trees of proper size were being cut; if stumps were too high; and if usable logs were being left. The record also reveals that Hamlen would tell Joe where to unload the logs when they were delivered at the yard in Little Rock. Appellees also rely on certain testimony tending to show Hamlen might have been able to discharge Joe if he refused to do the things, mentioned above, as directed by Hamlen or his agent, and also on the fact that Hamlen and Joe had no written contract.

243 Ark. 642, 421 S.W.2d 875-876.

The majority admits that no specific fact can be pointed to which establishes the employer-employee relationship. However, the majority concludes that all the facts and circumstances establishing proof, when considered together, are sufficient to present questions of fact to be decided by the jury, citing *Phillips Cooperative Gin Co.* v. *Toll*, 228 Ark. 891, 311 S.W.2d 171 (1958), which held that when it is demonstrated that the person causing an injury was at the time rendering service for another and being paid for that service, and "the facts presented are as consistent with the master-servant relationship as with the independent contractor relationship, then the burden is on the one asserting the independence of the contractor to show the true relationship of the parties." The facts presented in this case are inconsistent with the master-servant relationship, but consistent with the owner-independent contractor relationship. As acknowledged, there is no specific fact presented which establishes the employer-employee relationship.

The *Restatement (Second) of Agency* § 1 comment A (1958), provides that the relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him, subject to his control, and that the other consents so to act. The principal must in some manner

indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and "subject to his control." The essential elements are authorization and right to control. *Evans* v. *White, supra.* Johnson and J & N were not subject to the control of GP when physically cutting, loading, and hauling the logs to GP's mills, although they were subject to the control and direction of GP as to the end result of their work.

In *Southern Kraft Corporation* v. *McCain*, 205 Ark. 943, 171 S.W.2d 947 (1943), a contractor engaged in cutting wood at a stated price per cord was charged with the responsibility of hiring and firing his own men, furnishing their tools, and paying their wages. Southern Kraft exercised no control over them, except as to the result of the contract. This court held that these facts could lead only to the conclusion that an independent contractor relationship existed. *See also Crossett Lumber Company* v. *McCain*, 205 Ark. 631, 170 S.W.2d 64 (1943), and *Voss* v. *Ward's Pulpwood Yard*, 248 Ark. 465, 452 S.W.2d 629 (1970).

One can read into the facts presented and speculate, but based upon the entire record and the actual facts presented to the trial court, there is no substantial evidence to sustain the finding of the jury. The relationship between GP and Johnson and GP and J & N was clearly one of owner-independent contractor, and the judgment entered by the trial court should be reversed and dismissed as concerns GP.

INTERIM OPINION
DELIVERED JULY 11, 1988

752 S.W.2d 279

*Griffin, Rainwater & Draper, P.A.*, by: *Richard E. Griffin*, for appellant Georgia-Pacific Corporation.

*Laser, Sharp, Mayes, Wilson, Bufford & Watts, P.A.*, by: *Ralph R. Wilson*, for appellant Johnson Timber Corporation.

*McKenzie, McRae & Vasser*, for appellants Lemmie Smith and J & N Logging Company, Inc.

*Boswell, Tucker & Brewster; Shackleford, Shackleford & Phillips; Bramblett & Pratt;* and *Compton, Prewett, Thomas & Hickey, P.A.,* by: *Robert C. Compton,* for appellees.

PER CURIAM. We will consider the petition for rehearing and the motions filed in this case after the court reconvenes on September 6, 1988.

Special Justice GIBSON joins in the order; GLAZE, J., not participating.

### OPINION ON REHEARING SETTING ASIDE ORIGINAL OPINION OCTOBER 17, 1988

758 S.W.2d 415

DARRELL HICKMAN, Justice. On June 6, 1988, we handed down our decision in this case with Justice John Purtle delivering the opinion for the majority and Special Justice Mike Gibson dissenting. Justice Glaze did not participate. The appellants have filed a petition for rehearing, alleging any number of reasons therefor. The appellant Georgia-Pacific Corporation has filed a motion suggesting that Justice Purtle disqualify from further

participation in this case because he has a personal claim pending against Farmers Insurance Company, the insurer of one of the appellants.

■ Georgia-Pacific has also asked the remaining justices to consider disqualifying in view of the decision of the Supreme Court of the United States in *Aetna Life Ins. Co. v. Lavoie,* 106 S. Ct. 1680 (1986), and the more recent decision in *Liljeberg* v. *Health Services Acquisition Corp.,* 486 U.S. ___, 108 S. Ct. ___, 100 L. Ed. 2d 855 (1988). In *Aetna* Justice Embry, who wrote the opinion for the Alabama court in a 5/4 decision, was discovered to have personally filed two lawsuits against insurance companies which involved the same issues as the *Aetna* case. It was suggested that Justice Embry had written an opinion deciding his own lawsuits. The United States Supreme Court ordered the decision set aside. As it turns out, Justice Purtle has a claim against an insurance company of one of the appellants and that claim relates to the issue of an independent contractor which is the main issue in this case. We would not presume Justice Purtle intentionally erred or knew Farmers Insurance was involved in this lawsuit, but it was his duty as the judge assigned to write the opinion to know it. His personal legal business should never conflict with his role as a justice, and it is his duty, not ours or others, to see to that.

Justice Purtle has recused from further participation in this case and filed a contemporaneous opinion stating his position. His participation in the case, whether it was inadvertent or not, cannot be overlooked.

There is no doubt that, in view of the decisions in *Aetna* and *Liljeberg,* our decision must be set aside and resubmitted for consideration, and that is our order. It is our further duty which has given us pause and concern. Should we all remain in the case? Should we all disqualify and ask for a completely new panel of judges? Should we make that decision individually or as a body?

■ First, there is no doubt that the United States Supreme Court decisions do not require that we recuse from further participation. The petitioner, Georgia-Pacific, makes much of Justice Brennan's concurring opinion in *Aetna,* but it was a concurring opinion and was not adopted by the majority. In fact when the case was resubmitted to the Alabama Supreme Court, none of the other justices recused on the ground they had been

influenced by Justice Embry.

This does not mean, however, that any individual justice should hesitate to disqualify if he decides to do so. What a judge can do and ought to do are not always the same.

The choice is undoubtedly an individual one. We have considered the fact that the decision was not unanimous; we have considered the fact there was a special justice participating; we have considered our duty to the appellees who are entirely innocent in this matter, who have won their lawsuit at the trial level and essentially prevailed on appeal; and we have considered the nature of our decision. It was not a routine case and would unquestionably be an important precedent for future litigation. While we did not, in the opinion authored by Justice Purtle, overrule any of our prior decisions, a strong argument can be made that we did indeed depart from past decisions and head in a new direction.

Finally, we have considered the reputation of this court and its meaning to those who come to us for final judgment regarding their rights, privileges and liberties. While we are not expected to be a perfect institution, we are expected to always try to do the right thing. It is not easy to sit in judgment of one's self. Frankly, some of us believe we should remain in the case, others do not. Given the unavoidable choice of letting a decision stand under a cloud or removing the cloud entirely, we choose the latter. Considering all the circumstances in this case, we have decided it would be in the best interest of all concerned for each of us to step aside and allow the governor to appoint seven special justices to decide the case. At least that way all the parties are where they started before this unfortunate matter surfaced.

We therefore set aside our decision in this case. We will each notify the office of the governor of our recusal in accordance with the Arkansas Constitution.

Special Justice GIBSON joins in this opinion.

GLAZE, J., not participating.

## DISQUALIFYING OPINION OCTOBER 17, 1988

758 S.W.2d 417

JOHN I. PURTLE, Justice.

### COMMENTS UPON RECUSAL

Rule 27 of the Rules of the Supreme Court reads as follows:

> Whenever it is desired to suggest the disqualification of a Judge of this Court in a case to be submitted, the attorney so desiring shall present the matter to the Court in consultation *a reasonable time before the day of submission of the case.* [Emphasis added.]

This case was originally scheduled for submission on February 8, 1988, but was subsequently withdrawn because of the recusal of a justice. The appeal was formally submitted to this court for consideration on March 14, 1988. On that same date, this case was orally argued before the court by the attorney for Georgia-Pacific. The opinion of this court was delivered on June 6, 1988. Glaze, J., not participating. Special Justice Mike Gibson, dissenting. The motion suggesting disqualification and petition for rehearing were filed on behalf of Georgia-Pacific on June 23, 1988.

No suggestion of disqualification was timely or properly made in this case. The rule requires the party suggesting disqualification to present the matter to the court in consultation a reasonable time before the day of submission. This motion and its very consideration by this court completely ignore the plain words of Rule 27. Moreover, I interpret the rule to provide for a direct consultation between the justice concerned and the attorney suggesting disqualification.

I am not participating in the petition for rehearing in this case because of the manner in which the appellant Georgia-Pacific has handled the petition and the motion suggesting disqualification. For the record, I wish to state that I had no knowledge that Farmers Insurance Group had any interest in this case until I was informed of the motion and petition by a newspaper reporter who had received copies of these documents before I did. (The original record is no longer available. It was

checked out and "misplaced" by appellant Georgia-Pacific subsequent to the opinion of this court.)

I have done absolutely nothing improper or unethical. Nevertheless, this motion and petition, and the overt accusations concerning this justice's ethics contained therein, have no doubt created in some minds the impression that I have somehow acted with impropriety or with the appearance of impropriety. Consequently, to avoid even the appearance of impropriety, and to preserve the integrity of this court and our civil justice system, I hereby recuse from participation in the consideration of this petition for rehearing.

There is not a precedent-setting word in the entire opinion. I will say nothing further to defend my ethics and integrity in this unfortunate situation. However, considering the action by the court in vacating the opinion, I am compelled to state that the original opinion set out above is proper and correct. Let the legal community decide whose ethics are questionable and who followed the law.